Charles T. SAMUELSON

v.

BETHLEHEM STEEL COMPANY.

BETHLEHEM STEEL COMPANY

v.

Charles T. SAMUELSON.

No. 19643.

United States Court of Appeals
Fifth Circuit.

Sept. 27, 1963.

Rehearing Denied Dec. 11, 1963.

Jefferson D. Giller, James F. Weiler, Houston, Tex., Cleve Bachman, Beaumont, Tex., Fulbright, Crooker, Freeman, Bates & Jaworski, Houston, Tex., Orgain, Bell & Tucker, Beaumont, Tex., for appellant.

W. Brown Morton, Jr., Washington, D. C., Ewell Strong, Beaumont, Tex., Stanton T. Lawrence, Jr., New York

City, Strong, Moore, Pipkin, Strong & Nelson, Beaumont, Tex., Pennie, Edmonds, Morton, Barrows & Taylor, New York City, of counsel, for appellee.

Before TUTTLE, Chief Judge, and WISDOM and GEWIN, Circuit Judges.

WISDOM, Circuit Judge.

Charles T. Samuelson, the plaintiff, appeals from the judgment in a patent infringement suit holding that his patent for a submersible offshore drilling rig, while valid, was not infringed by Bethlehem Steel Company's structure. The defendant cross-appeals.

Before and immediately after World War II there was a well-recognized need for a self-contained mobile drilling platform which could be used for both drilling and exploration in the exposed offshore waters of the Gulf of Mexico. There were two principal types of structure then in use. The fixed structure was merely a pile-supported platform built like a dock in the water with the drilling equipment placed on top of it. This structure was adapted for drilling only in bayous and shallow waters where a known field was located and was unsatisfactory for exploration purposes. The other type, the Giliasso or bayou drilling barge, had mobility but, like the fixed structure, was limited to use in shallow, sheltered waters. It was simply a large barge with drilling equipment located sufficiently high on an upper deck to be above the water level when the barge was sunk at the drilling site. To prevent the barge from slipping during the drilling process, pilings fitted into tubes extending the depth of the barge were driven into the marine floor. In order to move the rig to another drilling location, the pilings were retracted, water was pumped out of the barge, and it was towed away. The major disadvantage of these barges was that they were restricted to use in fairly shallow water, because of the danger of capsizing during the sinking process and also because of stability limitations on the height of the upper platform.

After the end of World War II, a considerable amount of money and inventiveness were put into efforts to develop a mobile deep-water drilling rig which would not be dangerously unstable in rough weather and which could be firmly based on treacherously shifting ocean floors. The Samuelson invention was one of the products of this endeavor.

Samuelson's patent is directed toward the platform and does not include the drilling equipment or housekeeping facilities. In the plaintiff's structure the drilling equipment is placed on a buoyant working platform which, in turn, is connected by tubular columns to one or more submersible ground anchors, each of which has a buoyant chamber therein. The columns extend upward from the bottom of the ground anchors, through the buoyant chamber and loosely through guide means in the working platform so that the space between it and the ground anchors can be adjusted as desired. Within each column at the bottom of the ground anchor is a guide sleeve which directs the movement of a piling or spud. These pilings are driven into the ground after the ground anchors have been completely submerged and are resting on the Gulf floor. The pilings support no vertical weight and are intended solely to prevent horizontal shifting. Finally, means are provided to raise the working platform on the columns above the water and the lateral motion of the waves.

In operation, the mobile drilling platform is floated to the drilling location with the ground anchors drawn up against the buoyant working platform. They are then filled with water and sunk to the Gulf floor; the buoyant upper platform and connecting columns provide the necessary stability which prevents their capsizing during this process. Once the ground anchors are completely submerged and provide a stable base, the working platform is raised above the surface of the waves. Either before or after the elevation of the working platform, the spuds may be driven into the ground. Once the drilling operation has

been completed, these steps are reversed, and the rig is floated away.

Samuelson began work on this invention upon his retirement from running his own shipyards in Beaumont, Texas, in 1947 and applied for a patent on October 6, 1949. Later that year, or early in 1950, he submitted plans of his invention to the defendant, Bethlehem Steel Company. Bethlehem disavowed any interest in obtaining rights under the patent and returned the documents. Bethlehem, without Samuelson's permission, made and kept copies.

Bethlehem had been engaged for some time in experimenting with various designs for mobile offshore drilling rigs and in 1954 finished construction on Mr. Gus I. This unit, although usable in deep water, did not furnish a satisfactorily stable base since it was constructed partially of piling supported at all times on location and was constructed entirely of piling supported at the critical times of being set up or removed from drilling position; the piling had to be driven and pulled while the remainder of the structure was floating in the water. This created serious hazards for its use on loose, sandy bottoms with fluid soil conditions. Mr. Gus I tilted and broke two pilings on its maiden voyage, and in 1957 it turned over in about thirty feet of water off the Texas coast when a thin sandy layer of soil gave away under the pilings.

In 1956, Bethlehem began work on the infringing structure, Mr. Gus II, while Mr. Gus I was still in operation. It was completed in 1957. The trial judge described the construction and mode of operation of Bethlehem's second offshore drilling rig as follows:

" * * * Mr. Gus II uses as a ground anchor a single large steel hull sometimes called the 'mat.' This mat has four supporting columns, 10 feet in outside diameter and extending 232 feet upwardly from the bottom of the mat and attached to it. A buoyant working platform in the form of an upper hull or barge, is connected to these columns by the means of special hydraulic jacking systems which enable the platform to be moved up or down the columns to vary its space relationship to the mat at will. The jacking systems include guide tubes in the platform or upper hull through which the columns pass. Inside the columns, the bottom of which are open to the sea, are coaxial spuds or piles, seven feet in outside diameter, connected to the columns by an additional set of special hydraulic jacking systems by means of which the spuds can be pushed into the ocean bottom when the mat has been lowered by means of the platform jacks to rest thereon. The 130-feet long spuds are guided in the columns by a pair of narrow rings spaced 30 feet apart. These rings are each only some 6 inches high, are seven feet, one inch (7'1") in inside diameter, and are located, one at the bottom of the mat and one 20 feet above the top of the mat."

The trial judge found that this structure does not infringe the Samuelson patent, and the plaintiff appeals from this holding.

## I.

As is usual in such a suit, Bethlehem contests the valdity of the Samuelson patent, alleging that it embodies nothing new, nothing that was not known to prior art, citing, of course, Atlantic Works v. Brady, 1882, 107 U.S. 192, 2 S.Ct. 225, 27 L.Ed. 438, and Great A. & P. Co. v. Supermarket Equip. Corp., 1950, 340 U.S. 147, 71 S.Ct. 127, 95 L.Ed. 162. Samuelson's conceptual generalities were, Bethlehem insists, obvious to persons skilled in the art, and what was needed was metallurgical, mechanical, and hydraulic engineering to put the well-known generalities into a practical, working structure. Thus it points out that in 1947 the Hansen patent was issued, showing a lower buoyant hull connected by columns to an upper buoyant working platform, which, once the lower hull was ballasted and sunk on location, could be

raised by a winch and cable arrangement above the water level. Although this patent shows no spud or piling arrangement, retractible spuds were quite commonly used in the Giliasso barges and as early as 1860 the Edwards British patent featured piles which were driven into the marine floor through guide sleeves at the bottom of each compartment of a bridge caisson which had been sunk to the marine bottom. A Russian device, which was described along with several other proposed rigs in an article translated in this country in 1947, provides for an offshore drilling rig placed on one pontoon which is supported on slidable columns attached to a lower hull, which is sunk. The article suggests that any of the structures described therein can be fixed to the sea bed by means of piles driven through the supporting columns. This device, the defendant points out, contains all the elements of the Samuelson patent except a provision for raising the upper pontoon above the water level, and this was a feature of Hansen and several other patents. In short, the plaintiff's invention was merely an aggregation of several well-known techniques with no rightful claim to uniqueness or patentability.

 35 U.S.C.A. § 282 provides that

> "A patent shall be presumed valid. The burden of establishing invalidity of a patent shall rest on a party asserting it."

Any reasonable doubt will be resolved against the party alleging the invalidity of a patent. Mumm v. Decker & Sons, 1937, 301 U.S. 168, 171, 57 S.Ct. 675, 81 L.Ed. 983; Cameron Iron Works v. Stekoll, 5 Cir. 1957, 242 F.2d 17; Jeoffroy Mfg. Co. v. Graham, 5 Cir. 1955, 219 F.2d 511. Bethlehem has not met this burden. No prior invention disclosed the same combination of devices as the claims at issue in the Samuelson patent, and it is not at all clear that the entire invention would have been obvious to a person having ordinary skill in the art.

This Court has on several occasions held a patent invalid as a mere *aggregation* of old elements and not a patentable *combination*. For example, see Murray Company of Texas, Inc. v. Continental Gin Co., 5 Cir. 1959, 264 F.2d 65; Stabler v. Bright Leaf Industries, Inc., 5 Cir. 1958, 261 F.2d 383. An excellent explanation of "aggregation" is set forth in Application of Worrest, 1953, 40 CCPA 804, 201 F.2d 930, 934:

> "The term 'aggregation' appears to be used by the courts in either one of two different ways. It is applied in one sense to a device having two or more unrelated, independent units or elements, each of which performs its functions separately, uninfluenced by and indifferent to the action of the other units. There is no essential or inherent correlation, or cooperation, or coordination of elements which mutually contribute to a common purpose or result, other than mere convenience due to juxtaposition or collection of the units in a common setting. It is applied in another sense (almost invariably preceded by a deprecating adjective as, for example, 'mere aggregation') to devices which really appear to be a combination of two or more units coacting or cooperating in the full sense of the term, but which the court regarded as not displaying the exercise of invention because no new or unexpected result was produced by the combination. It seems to us that the former is the correct use of the term. In the latter case, such a device should, in our opinion, properly be regarded as an unpatentable combination, and not as an aggregation."

In the case before us it cannot be said that Samuelson's structure has two or more, unrelated, uninfluenced units or elements. That arrangement is not present in the combination of claims 1 and 10. The various elements cooperate, they are not unrelated, and they do influence each other. When all the elements of claims 1 and 10 are used, the spud and

guide sleeve arrangement can be used in only one particular portion of the sequence—when the ground anchor is on the ground. This is clearly specified in the claims. For example, claim 1 provides that " * * * said spud *when the anchor is submerged to rest on the underwater ground* arranged to be forced into the ground to retain the anchor in a fixed position * * *." Thus, the claim itself specifies coaction, an interaction between the spud, guide sleeve, and column arrangement with the remainder of the components of the combination.

Samuelson devised a structure which not only would be stable, regardless of the composition of the marine bottom, but would not be subject to lateral motion by either waves or underwater currents. Moreover, his particular device of spuds placed within guide sleeves inside the columns would sharply reduce the friction caused by marine growth and likewise reduce the likelihood of the spuds being bent during the retraction process. It is true that these favorable results were achieved principally through a combination of very old devices. "[But] a combination whether composed of all old, or some old and some new elements, is patentable if it achieves an altogether new and useful result. * * * The life of such a combination is not to be destroyed by excision of its several parts without benefit of anaesthesia, nor is the cause of its vitality to be discovered by the prosecutor's retrospective dissection." Bryan v. Sid W. Richardson, Inc., 5 Cir. 1958, 254 F.2d 191, 194, cert. den'd 1958, 358 U.S. 815, 79 S.Ct. 22, 3 L.Ed.2d 57. As the Supreme Court observed in Diamond Rubber Co. v. Consolidated Rubber Tire Co., 1911, 220 U.S. 428, 31 S.Ct. 444, 55 L.Ed. 527:

"Many things, and the patent law abounds in illustrations, seem obvious after they have been done, and, 'in the light of the accomplished result,' it is often a matter of wonder how they so long 'eluded the search of the discoverer and set at defiance the speculations of inventive genius.' [Citations omitted.] Knowledge after the event is always easy, and problems once solved present no difficulties, indeed, may be represented as never having had any, and expert witnesses may be brought forward to show that the new thing which seemed to have eluded the search of the world was always ready at hand and easy to be seen by a merely skillful attention."

We cannot now, with the benefit of hindsight, say that the particular combination of devices embodied in the Samuelson patent was as obvious in 1949 as it is fourteen years later. We affirm the finding of the validity of the patent in suit.

## II.

Defendant next argues that any construction of the Samuelson patent narrow enough to avoid the prior art will be too limited to support a holding of infringement by its structure. Samuelson here is urging two claims, numbers one and ten. Claim one sets forth the following details:

1. (a) In a floating barge for subaqueous operations,

(b) a buoyant working platform,

(c) a submersible ground anchor below the platform and and having

(d) a buoyant chamber therein,

(e) a tubular column extending upwardly from the bottom of said anchor and through said chamber and the top thereof, said platform having

(f) guide means through which said column loosely extends, the bottom of said anchor having

(g) a guide sleeve projecting upwardly into said column,

(h) a spud extending axially through said column and slidably engaging said sleeve, said spud when the

anchor is submerged to rest on the underwater ground arranged to be forced into the ground to retain the anchor in a fixed position, and

(i) means for introducing water into the chamber for moving the column and anchor downwardly relative to the platform.

Bethlehem points out that while the mat in Mr. Gus II has some buoyant chambers which can be flooded, the columns do not pass through them, as stipulated by (e) they pass through the chambers that are permanently buoyant. Moreover, the mat itself is normally kept at substantially neutral buoyancy and is lowered by means of jacks, not by letting water into it. Bethlehem also denies that it has the "guide sleeves" called for in (g), since it employs two narrow "guide rings" spaced thirty feet apart to perform this function.

Claim 10, which incorporates claim 9 by reference, presents the following features:

9. (a) In a floating barge for subaqueous operations.

(b) a working platform,

(c) spaced submersible ground anchors below the platform and having

(d) buoyant chambers therein, each of said anchors having

(e) spaced pairs of tubular columns extending upwardly from the bottom and through the chamber and top thereof, said platform having

(f) guide means, through which said columns loosely extend, the bottom of each anchor having

(g) spaced guide sleeves extending upwardly into an adjacent column,

(h) a spud axially movable in each of said columns and slidably engaging a guide sleeve therein, the spuds when the anchors are submerged to rest on the underwater ground to maintain the anchors in a fixed position, and

(i) fluid supply means in each of said columns communicating with its associated chamber for flooding the latter to lower the anchor so as to rest on the underwater ground.

10. In a floating barge as called for in claim 9 in which means mounted on the columns are operatively connected to the platform for raising the latter relative to the anchors and above the surface of the water when the anchors are submerged to engage the underwater ground.

In regard to claims 9 and 10 Bethlehem reiterates the differences between the Samuelson invention and Mr. Gus II in regard to guide sleeves, the particular type of chamber in the ground anchor through which the columns pass, and the means for lowering the ground anchor and contends that Mr. Gus II also does not have "spaced submersible ground anchors", since its ground anchor is a single large unitary mat. This feature of Mr. Gus II also precludes it from having "spaced pairs of tubular columns", because any "pairing" of the columns would be entirely arbitrary.

Bethlehem is able to avoid a finding of infringement, however, only by ignoring the doctrine of equivalents. As this Court stated in Matthews v. Koolvent Metal Awning Co., 5 Cir. 1946, 158 F.2d 37, 40:

"We are not concerned here with determining whether defendant's device, which plaintiffs charge is an infringement of the Matthews patent, is exactly the same in appearance or in form, but merely whether it is substantially the same in function. * * * The doctrine of

equivalency has never been a mere dry bones doctrine. Put forward to do justice and prevent defrauding by dissimulation and deceit, it should be, it has been, applied to give its equitable purpose effect. Not at all recondite or difficult of understanding or application, it is the mere expression and application of the view that like things are alike and that they are not made unlike by formal and nonsubstantial changes, no matter how cunningly contrived the dissimulation, how clever the changes in form."

The Supreme Court stated the essence of the doctrine in the leading case, Graver Tank Co. v. Linde Air Products Co., 1950, 339 U.S. 605, 608, 70 S.Ct. 854, 856, 94 L.Ed. 1097:

"The essence of the doctrine is that one may not practice a fraud on a patent. Originating almost a century ago in the case of Winans v. Denmead, 15 How. 330, [14 L.Ed. 717,] it has been consistently applied by this Court and the lower federal courts, and contains today ready and available for utilization when the proper circumstances for its application arise. 'To temper unsparing logic and prevent an infringer from stealing the benefit of an invention' (1. Hand in Royal Typewriter Co. v. Remington Rand, 2 Cir., 168 F.2d 691, 692) a patentee may invoke this doctrine to proceed against the producer of a device 'if it performs substantially the same function in substantially the same way to obtain the same result' Sanitary Refrigerator Co. v. Winters, 280 U.S. 30, 42 [50 S.Ct. 9, 13, 74 L. Ed. 147] (3 USPQ 40, 44). The theory on which it is founded is that 'if two devices do the same work in substantially the same way, and accomplish substantially the same result, they are the same, even though they differ in name, form, or shape' Machine Co. v. Murphy, 97 U.S. 120, 125 [24 L.Ed. 935]. The doctrine operates not only in favor of the patentee of a pioneer or primary invention, but also for the patentee of a secondary invention consisting of a combination of old ingredients which produce new and useful results. Imhaeuser v. Buerk, 101 U.S. 647, 655, [25 L.Ed. 945], although the area of equivalence may vary under the circumstances (citing cases)."

There is an especial necessity for applying this doctrine to a patent such as the one in suit, which has combined several pre-existing devices in order to arrive at a new and satisfactory solution to the problems of offshore oil and gas exploration and drilling. "Combination patents would generally be valueless in the absence of a right to equivalents, for few combinations now exist, or can hereafter be made, which do not contain at least one element, an efficient substitute for which could readily be suggested by any person skilled in the particular art." Walker, Patents, § 464, p. 1701.

Bethlehem has, we feel, merely substituted equivalent elements for some of the features in the combination and thus has not avoided the claims. It is clear that the two spaced "rings" in each column of Mr. Gus II and the "guide sleeves" required by both claims 1 and 10 serve the same functions of guiding the spuds and reducing the friction which would be entailed by a guide tube the entire length of the spud. The "rings" are each six inches wide and seven feet one inch in diameter and are shaped similarly to the "sleeves" in the Samuelson patent. We can see no convincing distinction between the two. The same is true of the requirement for a floodable chamber in the ground anchor with a column extending therethrough. Mr. Gus II has a ground mat divided into several chambers, some of which are permanently buoyant, some permanently flooded, and some floodable. Although its columns pass through a permanently buoyant compartment, this does not, as James E. Steele, the designer of Mr. Gus II admitted, change the mode of operation of the structure. It is true, as plain-

tiff concedes, that the buoyancy of the mat is usually not varied but the defendant has stipulated that

"Means are provided for regulating the water ballast in a number of the chambers in the ground anchor or mat so that the buoyancy of the mat or ground anchor may be changed from a positive buoyancy to a negative buoyancy, or vice versa, at will, under control from the working platform, regardless of the vertical spacing between mat and platform. (A body with a negative buoyancy will sink and a body with a positive buoyancy will float.)"

Since claim 1(i) merely requires some "means for introducing water into the chamber for moving the column and anchor downwardly relative to the platform,"

we think this feature is squarely met by Mr. Gus II, even though the "means for introducing water" into the floodable tanks of the mat are rarely if ever used.

Claim 1, then, is infringed by Mr. Gus II. What of the combined claims 9 and 10? Although their requirement that there be some "fluid supply means in each of said columns communicating with its associated chamber for flooding the latter to lower the anchor so as to rest on the under-water ground" seems to differ, at least in its specificity from claim 1(i), the defendant does not press this distinction between the two claims. It apparently accepts as correct the description by the plaintiff's expert witness of the columns of Mr. Gus II as containing piping which connects them to the floodable tanks and is the means for introducing water into these compartments. Thus the only additional feature of claims 9 and 10 which is in issue is the requirement for spaced ground anchors having spaced pairs of tubular columns.

The U-shaped ground anchor of Mr. Gus II does not avoid this claim. The mat of defendant's rig was constructed in two parts which were then placed parallel to each other and connected by means of plating. There is no stipula-tion in claims 9 and 10 that the spaced submersible ground anchors must be disconnected, and, in fact, one of the drawings submitted with the Samuelson patent application shows two ground anchors connected by rigid trusswork. The conversion in Mr. Gus II of connecting trusswork into part of the body of the ground anchor itself is not a sufficient modification to avoid infringement.

■ This Court stated in Cameron Iron Works v. Stekoll, 5 Cir. 1957, 242 F.2d 17, 21:

"We agree with appellee that the question of infringement is usually a question of fact, and that the Supreme Court so declared in the Graver Tank Co. case. But the rule there announced is subject to this important exception, and that is that where, as here, the facts are undisputed and the case can be determined by a mere comparison of the structures, and extrinsic evidence is not needed for purposes of explanation or evaluation of prior art, or to resolve questions of the application of descriptions to subject-matter, the question of infringement may be determined as a question of law, and that we shall do."

The same considerations apply in the present case. The structure and mode of operation of the infringing rig have been stipulated to by Bethlehem. Thus this Court need only compare the claims set forth in the Samuelson patent with the undisputed structure of Mr. Gus II in order to determine whether, as a matter of law, there is infringement. See Industrial Instrument Co. v. Foxboro Co., 5 Cir. 1962, 307 F.2d 783; Guiberson Corp. v. Equipment Engineers, Inc., 5 Cir. 1958, 252 F.2d 431; Matthews v. Koolvent Metal Awning Co., 5 Cir. 1946, 158 F.2d 37.

■ We hold, therefore, that defendant's rig, Mr. Gus II, does infringe claims 1 and 10 of the Samuelson patent.

The judgment of the lower court is reversed and remanded for a finding of infringement.