HUGHES TOOL COMPANY, Appellant,

v.

VAREL MANUFACTURING COMPANY, Inc., Appellee.

VAREL MANUFACTURING COMPANY, Inc., Appellant,

v.

HUGHES TOOL COMPANY, Appellee.

No. 20661.

United States Court of Appeals Fifth Circuit.

Feb. 12, 1964.

Rehearing Denied Sept. 21, 1964.

Robert F. Campbell, Houston, Tex., Edward A. Haight, Chicago, Ill., Roy H. Smith, Jr., Andrews, Kurth, Campbell & Jones, Houston, Tex., Fred T. Porter, Leachman, Gardere, Akin & Porter, Dallas, Tex., Haight, Simmons & Hofeldt, Chicago, Ill., for Hughes Tool Co.

Robert A. White, Houston, Tex., Morris I. Jaffe, Wm. C. Baker, Dallas, Tex., Baker, Botts, Shepherd & Coates, Houston, Tex., Wynne, McKenzie, Jaffe & Tinsley, Dallas, Tex., for Varel Mfg. Co.

Before BROWN, MOORE * and GEWIN, Circuit Judges.

JOHN R. BROWN, Circuit Judge.

Reacting as do their brother attorneys in traditional jury trials, Williams v. National Surety Corp., 5 Cir., 1958, 257 F.2d 771, 773, or proctors in the esoteric admiralty area, Ohio Barge Line, Inc. v. Oil Transp. Co., 5 Cir., 1960, 280 F.2d 448, 449, 1961 AMC 375, these patent-solicitor-advocates are here ostensibly asserting legal errors, but actually seeking at our hands a new look at the facts. Only in the most superficial way is there even the remotest possible whisper of a suggestion of difference over a single significant legal principle.[1] What has happened is that all parties have transferred from the District Court to us the whole case in the mistaken, but optimistic, hope that with three heads it will not only turn out differently, the result will be better. But as elsewhere, this does not reckon with the principles behind F.R.Civ.P. 52(a) which commits to trial judges, not us, the important and frequently decisive role of fact finding. We therefore affirm.

This contest, between Hughes,[2] a long time leader in the field of oil well drilling bits, and Varel,[3] the alleged infringer, concerns validity and infringement of patents (a) 2,687,875,[4] (b) 2,774,571,[5] and (c) 2,774,570.[6] The trial Court held (a) valid but uninfringed and held (b) and (c) invalid. Hughes appeals from the holding of noninfringement of (a) and invalidity of (b).[7] Varel cross appeals from the holding of validity of (a).

The subject matter of the patents in suit is a rotary drill bit designed for more efficient drilling in extremely hard, highly abrasive rock formations. They are primarily directed to rotary drill bits of the type having a roller cone construction. They embody a head, which can be threaded onto the lower end of the drill stem, and three generally conical-shaped cutters mounted on bearings at the lower end of the head. As the drill stem is turned, the cutters roll upon the bottom of the hole being drilled to disintegrate the rock formation. The earth-drilling, if not earth-shaking, Merry Mfg. Co. v. Burns Tool, 5 Cir., 1964, 335 F.2d 239 [1964], contribution is the use of rounded, ovoid-shaped cutting elements in the form of hard, wear-resistant compacts which are inserted in the face of, and protrude from, the conical cutter in annular rows. These compacts are an extremely hard, but brittle, material such as sintered tungsten-carbide. These "button" compacts take the place of the billed, chisel-shaped teeth of the tradi-

---

\* Of the Second Circuit, sitting by designation.

1. Validity, while often a pure legal question, is frequently one of fact for resolution by the trier, including a jury. Swofford v. B & W, Inc., 5 Cir., 1964, 336 F.2d 406.

2. Hughes Tool Company.

3. Varel Manufacturing Company, Inc.

4. Issued August 31, 1954, upon application of Morlan, Scott, and Woods, filed November 20, 1951.

5. Issued December 18, 1956, on application of Morlan filed July 6, 1954.

6. Issued December 18, 1956, on application of Cunningham filed May 3, 1954.

7. No appeal is taken as to invalidity of (c).

tional roller rock bit. Experience had long proved that in hard, abrasive formations, the useful life of milled cutter bits was often but a few feet, and the rate of penetration very slow. Both in cost of the bits and more so in the cost of time in pulling the drill pipe for removal and renewal of worn bits, the industry had long sought a bit of faster penetration and longer drilling life.

The commercial embodiment of these bits both by Hughes and its competitors has met with great success and industrial acceptance. The bits have not only increased penetration capacity considerably, but also have an average drilling life of four to five times, and, in some cases, eight to ten times, that of the best available previous bit. Ironically, the Patentee's contention of invention beyond the skill of the law's mechanic, rests on the instinctive initial rejection of the bits by practical men in the field. The cones, with rows of hemispherical button-like protrusions, looked ineffectual in contrast to the traditional rock bit with jagged milled cutter teeth. One early customer remarked, "I have got a bit sharper than that in my dull pile." [8]

Attacking validity of (a), Varel asserts two primary contentions. The first is that inserts of hard wear-resistant metals

in drill bits had long been recognized. The second, akin to the first, was that the utility of the bit over the general lack of success in prior-art bits was due, not to the round-end form of the insert, but to the improvement of metals and particularly the newer kinds of sintered tungsten-carbide. Joining issue, Hughes asserted that the great discovery was in the form of the button-like insert. This was, to be sure, affirmatively emphasized in the disclosures of the patent and the fact that in all but one of the 11 claims, the outer end of the wear-resistant inserts are described as ovoid or arcuate,[9] which terminology the specifications then defined precisely.[10]

Whatever we might have concluded as a factual matter were we hearing this evidence, we think the Judge's findings more than pass muster under F.R.Civ.P. 52(a). The record seems overwhelming that sintered tungsten-carbide was available for many years. If advances in metallurgy afforded any improvement in its application as possible drill inserts, the evidence is not so convincing as to drive the fact finder to the conclusion that it was the new material, not the shape of it, that counted. Likewise, the evidence was quite ample to show that inserts having chisel, cylindrical, conical or simi-

**8.** This is a reverse twist of the Fourth Circuit's observation in Florence-Mayo Nuway Co. v. Hardy, 4 Cir., 1948, 168 F.2d 778, 781:
"We must try, however, to avoid the danger which Judge Evans has recently pointed out of thinking there is no invention merely because we can understand a mechanism after it has been explained to us. National Slug Rejectors v. A.B.T. Mfg. Co., 7 Cir. [1947], 164 F.2d 333, 336."

**9.** Subdivided to facilitate analysis, Thermo King Corp. v. White's Trucking Serv., Inc., 5 Cir., 1961, 292 F.2d 668, 675–76, nn. 9, 10, claim 1, typical of the others all except 7, reads:
"A rotary well drill comprising,
"a head,
"inwardly extending shafts thereon,
"rolling cutters rotably mounted on said shafts, at least one of said cutters comprising a body having peripheral lands,

"and a row of wear-resistant inserts in each of said land, each of said inserts having an *ovoid outer end* protruding from the periphery of its associated land to present a *rounded surface* to produce disintegrating action upon the formation being drilled." (Emphasis supplied.)

**10.** The specifications stated:
'The word 'ovoid' is used to state that the outer ends of the wear resistant inserts are rounded or arcuate as distinguished from conical, pyramidal, or chisel edged. It comprehends spherical, ellipsoidal or other rounded end configuration as will further appear."
Webster, Third New International Dictionary defines the terms as follows:
Ovoid—"shaped like an egg; egg-shaped with the large end toward the point of attachment."
Arcuate—"bent or curved in the form of a bow."

lar ends were not practicable because, in such forms or shapes, the brittle characteristic of tungsten-carbide could not withstand the stress, pressure, and abrasion encountered in drilling operations. To offset this, Varel's theory was that the initial rounded shape of the compacts was of no significance since, in actual operations, the chisel, pointed, conical forms would be rounded off in a short time. This was, of course, a factual matter, and it undertook to establish this through an expert of impressive competence. Persuasive as some of his testimony, demonstration and exhibits may have been, cross examination—as it most always does with any expert—demonstrated enough uncertainty as to many inescapable assumptions and hypotheses that the Judge was not forced to credit this opinion and reject a considerable body of contrary opinion reflected in the testimony and records advanced by Hughes.

We therefore affirm the District Court's judgment upholding the validity of No. 2,687,875.

The claim of infringement of (a) had two aspects. Varel stipulated that certain bits manufactured and sold for a time were almost a "Chinese" copy and that if the patent were valid, the Court should enter an appropriate decree for infringement relief.[11] The real controversy turned on whether there was infringement by inserts which, broadly speaking, had a series of angular surfaces. In its brief attacking the holding of noninfringement, Hughes recognizes that the "ends * * * although blunt, were not literally rounded or ovoid." It then went on to describe Varel's modified bits. "In its modified bits, [Varel] utilized multiple concentric bevels to achieve an insert having the desired degree of bluntness. In cross-section, the ends of such inserts appear as a series of chords of an arc * * *," which as "imperfectly rounded inserts * * * might also be described as chordal-hemispherical."

Since literal infringement is not urged, Hughes relies on the doctrine of equivalents and the colorful language Judge Hutcheson penned for us in Matthews v. Koolvent Metal Awning Co., 5 Cir., 1946, 158 F.2d 37, 38.[12] Likening Varel's imitation to the infringer's unsuccessful effort to get by with an octagonal railroad car under a claim calling for a circular body [13] and a similar fate from the use of two consecutive chords instead of the curbed saw guides called for in the claim,[14] Hughes insists that for all practical purposes the modified inserts are both the actual and legal equivalent of those called for in this patent. As we pointed out earlier, there is and can be no dispute about what the doctrine of equivalents is or means. Nor do we have much quarrel with the practical similarity of these two compacts. Hughes fails, not because the law as an abstract proposition is against it, or because, from an operational mechanical point of view, there is much difference between the elements. Hughes fails because to get this patent granted and the claims allowed in the first place, it was necessary—in order to overcome the prior art—that this patent offer its own restricted definition of inserts which had ovoid or arcuate ends.

The file wrapper reflects that all of the claims were initially rejected on the cited references, several of which bore a close resemblance to the patentee's proposed structure, the principal difference being in the shape of the protruding ends of the inserts. To meet these objections, the claims were redrawn and resubmitted by a response which urged

11. This part of the Court's decree is not challenged here.

12. Hughes stresses also Graver Tank Co. v. Linde Air Products, 1950, 339 U.S. 605, 607–08, 70 S.Ct. 854, 94 L.Ed. 1097, and our own Allis-Chalmers Mfg. Co. v. Columbus Electric Co., 5 Cir., 1927, 19 F.2d 860; and Samuelson v. Bethlehem Steel Co., 5 Cir., 1963, 323 F.2d 944, 949.

13. Winans v. Denmead, 1853, 56 U.S. (15 How.) 330, 340, 343–44, 14 L.Ed. 717.

14. Ives v. Hamilton, 1875, 92 U.S. 426, 23 L.Ed. 494.

that the distinguishing element was the ovoid or arcuate form of the ends. It is perfectly evident that it was solely on this basis that the patent was approved and issued. The District Judge, again with an ample factual basis of extensive prior art documentary exhibits and the illuminating testimony of contending experts, reached a firm conclusion. The Court stated, "prior patents and publications demonstrate that drill bit design had anticipated the use, as cutting elements, of wear-resistant inserts in various shapes including conical, pyramidal, wedge or chisel and square edged." At the same time, however, the Court found that "use of ovoid, or round shaped inserts was not anticipated."

Whether decision rests on claims construction or an application of file wrapper estoppel does not really matter. The record, in the light of these findings which come here with the "buckler and shield of F.R.Civ.P. 52(a)," Rea Constr. Co. v. B. B. McCormick & Sons, Inc., 5 Cir., 1958, 255 F.2d 257, 258, demonstrates that to obtain the patent, the shape of the ends had to be carefully distinguished. The patentee undertook to do this by precise terminology. The patentee, having, in that process become its own lexicographer, Thermo King v. White's Trucking Service, Inc., 5 Cir., 1961, 292 F.2d 668, 675; Thurber Corp. v. Fairchild Motor Corp., 5 Cir., 1959, 269 F.2d 841, 851, the equivalents were inescapably narrowed to those having the rounded characteristic of ovoid or arcuate. Both by the forms distinguished and those comprehended by the patent's definition, see note 10, supra, the Judge was entitled to find that the accused insert was not the patent-law equivalent of the shapes so carefully, articulately and deliberately claimed.[15]

We therefore affirm the District Court's holding of noninfringement of No. 2,687,875.

This leaves only the finding of invalidity as to (b), patent No. 2,774,571. All this did was to eliminate the single spear-point feature of prior bits manufactured by Hughes under (a) and (c). With three cones of equal length assembled in a single head, the operation of early rolling cutter bits left a core because of the space at the apex of the cones. The industry subsequently developed the spear-point feature which, broadly speaking, resulted in one of the cones being longer so that the spear rotated through the space where the core would otherwise occur. Use of the single spear-point cone with "button" inserts proved unsatisfactory as the point tended to wear out more rapidly causing injury to bearings and bushings. Patent (b) is described as an improvement of (a). All that this patent did was to provide for hard, wear-resistant ovoid inserts concentrated in the nose portions of each of three conical cutters of equal length. The District Court with ample basis found as a fact that the "use of the tricone device remaining after elimination of the single spear-point * * * was well known to prior art." To then prescribe that the ovoid inserts should be used was certainly no discovery. That discovery had been made in patent (a). The Judge was therefore on sound ground in reaching the factual conclusion that the "arrangement of the ovoid inserts in the nose portions of the cones was a matter of mechanical skill and would have been obvious to one skilled in the art from the bits constructed in accordance with the teachings of the Patent No. 2,687,-875."

As we can see no possible basis for invention in (b) apart from the statutory presumption, 35 U.S.C.A. § 282, it is not surprising that Hughes attacks these observations of the District Judge: "The presumption of validity accorded an issued patent is infinitely weaker than that

15. Although claim 7 does not use the ovoid or arcuate terminology as do all of the other claims, this must either be read into claim 7 as the Judge found, or the claim, without it, is deemed invalid. In neither case could it support an award for infringement. In the context of this record, Hughes gets no comfort from Cameron Iron Works, Inc. v. Stekoll, 5 Cir., 1957, 242 F.2d 17, 21.

which attends findings of other administrative bodies, being hardly more than a procedural device to establish a prima facie case that cannot survive in the light of facts showing a lack of invention."

 But we do not have to assay the correctness of this comment when measured against the statute and our frequent comments about it [16] because Judge Hutcheson for our Court has also made clear that the " * * * presumption of patentability which attends the grant of a patent cannot survive in the face of undisputed facts showing that there is no invention." Butex Gas Co. v. Southern Steel Co., 5 Cir., 1941, 123 F.2d 954, 955.

The consequence is that as with the other phases of the case, we affirm the holding of invalidity as to No. 2,774,571.

Affirmed.

---

16. Jeoffroy Mfg. Co. v. Graham, 5 Cir., 1955, 219 F.2d 511, 519; Samuelson v.

Bethlehem Steel Co., 1963, 323 F.2d 944, 947.