**RAILEX CORPORATION, Plaintiff-Appellant,**

v.

**The SPEED CHECK CO., Inc., Defendant-Appellee.**

**No. 71-1558.**

United States Court of Appeals,
Fifth Circuit.

April 10, 1972.

Charles M. Kidd, Atlanta, Ga., John M. Calimafde, Sandoe, Hopgood & Calimafde, Marvin N. Gordon, New York City, for plaintiff-appellant.

Henry M. Hatcher, Jr., Hatcher, Meyerson, Oxford & Irvin, Atlanta, Ga., for defendant-appellee.

Before WISDOM, COLEMAN, and SIMPSON, Circuit Judges.

WISDOM, Circuit Judge:

Plaintiff-appellant Railex Corporation and defendant-appellee The Speed Check Company, Inc. are competitors in the business of manufacturing conveyors for the textile industry. Railex sued Speed Check for the alleged infringement of Railex's patent on a conveyor used for the selective dispatching of garments. From the district court's decision holding the patent invalid and not infringed, this appeal results. We affirm.

## I.

Railex holds Patent No. 3,118,531.[1] The patent describes a system for conveying and dispatching garments or laundry selectively to any one of several stations located throughout a plant. In a laundry or dry cleaning plant several distinct operations may be performed on a garment during the process of cleaning. Similarly, different fabrics may be cleaned by distinct methods or with various cleaning agents. Each operation will take place at a different location within a single plant. The patented system facilitates the transporting of garments to appropriate locations within the plant and the selective discharge of the garments at the appropriate location.

The patented conveyor-dispatcher consists of a chain of links, all substantially identical in shape. Each link is flat and elongated. The links are connected to each other to form an endless moving belt. The lower part of the link consists of a series of hook-like fingers at graduated levels used for the carrying of garments. Each hook level represents a specific station within the plant. At each station there is a rod mounted at the precise level of the appropriate hook which dispatches the garments for that station. Each link is approximately one foot long and has hooks to serve six stations. A worker can place a garment on a hook and cause the garment to be conveyed to a particular station in the plant and automatically dispatched at that station. The operator always has a link in front of him, since the links are interconnected and form the conveyor belt, and can easily choose the correct hook which corresponds with the desired station.

On October 7, 1964, Railex sued Speed Check for the alleged infringement by Speed Check of the conveyor-dispatcher patent. Speed Check denied infringement and asserted that the Railex patent was invalid in view of the prior art and because Speed Check's president was allegedly the inventor of the patented system. The action was tried from October 14 through October 17, 1969. On December 11, 1970, the district court issued an "Order", including findings of fact and conclusions of law, holding the patent invalid and the patent not infringed. Railex appealed.

## II.

At the outset, we meet Railex's contention that the district court's finding should not be reviewed under the clearly erroneous standard of Rule 52.[2] Railex points out that the district judge

---

1. The patent application was filed April 5, 1961, and the patent issued on January 21, 1964. Railex relies on Claim One of the patent.

   1. Conveyor comprising, an endless rail, article carrying means mounted for movement longitudinally along said rail and comprising an endless series of rigid links disposed in end-to-end relation and pivotally connected to each other at their respective adjacent ends for pivotal movement in vertical and horizontal planes, a plurality of said links each having each link being disposed in a vertical plane, a similar series of article carrying hooks integral with the companion link and spaced from each other longitudinally of said rail, at least a pair of said hooks of each link being at different levels, respectively, and a series of longitudinally spaced operating means positioned along the path of movement of said hooks for article removal operation with selective ones only of said hooks for selective removal of the articles carried thereby, one of said operating means being at a level corresponding to the level of one of said hooks of each of said pairs of hooks of each series of hooks and in position for operation with respect to said one hook only, and another of said operating means being at a different level corresponding to the level of the other of said hooks of each of said pairs of hooks of each series of hooks and in position for operation with respect to said other hook only.

2. In all actions tried upon the facts without a jury or with an advisory jury, the court shall find the facts specially and state separately its conclusions of law thereon, and judgment shall be entered pursuant to Rule 58. . . . Findings of fact shall not be set aside unless clearly erroneous, and due regard shall

waited until fourteen months after the conclusion of the trial to issue his ruling. The district judge's findings were adopted, almost verbatim, from proposed findings submitted by Speed Check at the request of the judge. Railex argues that in these circumstances the district court's findings "should not be accorded that respect normally accorded findings under Rule 52".

The clearly erroneous standard of review is applicable to findings of fact in a patent case. *See* Phillip's Petroleum Co. v. Sid Richardson Carbon & Gasoline Co., 5 Cir. 1969, 416 F.2d 10, 12; American Seating Co. v. Southeastern Metals Co., 5 Cir. 1969, 412 F.2d 756, 758. Although, as we have stated, "findings and conclusions which represent the independent judicial labors and study of the district judge are more helpful to this Court", Kinnear-Weed Corp. v. Humble Oil & Refining Co., 5 Cir. 1958, 259 F.2d 398, 401, "[n]evertheless, the same test is applied to findings, whether the court prepared them or adopted those submitted by counsel". Edward Valves v. Cameron Iron Works, 5 Cir. 1961, 289 F.2d 355, 356. In Louis Dreyfus & C. I. E. v. Panama Canal Co., 5 Cir. 1962, 298 F.2d 733, we discussed, at length, the contention that findings adopted by the court from proposed findings submitted by the parties should not be reviewed under the clearly erroneous standard. Noting that "in analyzing the significance that should be attached to the adoption by the trial judge of findings drafted by one of the litigants, common sense may be a better guide than ideal decision-making", we concluded:

We disapprove of the practice of a trial judge's uncritically accepting proposed findings, but this unfortunate practice does not erase the "clear-

be given to the opportunity of the trial court to judge of the credibility of the witnesses.
F.R.Civ.P. 52(a).

3. Whoever invents or discovers any new and useful process, machine manufac-

ly erroneous" rule. . . . When substantial evidence supports a finding it will not be found clearly erroneous merely because the expression of the finding was adopted from a proposal by counsel.

*See also* Lorenz v. General Steel Products Co., 5 Cir. 1964, 337 F.2d 726; 2B Barron & Holtzoff, Federal Practice & Procedure, Rules Ed., § 1124, p. 494; 6 Moore's Federal Practice ¶ 52.06[3], pp. 2664–2665. The Supreme Court is in accord. "[F]indings, though not the product of the workings of the district judge's mind, are formally his; they are not to be rejected out-of-hand, and they will stand if supported by evidence." United States v. El Paso Natural Gas Co., 1964, 376 U.S. 651, 656, 84 S.Ct. 1044, 1047, 12 L.Ed.2d 12, 17.

■ On this record, we find no reason to discredit the district judge's assertion that his ruling was made "after considering . . . [the] issues and the evidence" and that he "considered the pleadings, briefs, proposed findings of fact, proposed conclusions of law and arguments of both parties" before issuing his order. Nor can we say that various errors in the rulings indicate a lack of understanding of the case on the part of the district judge. Although, as we stated in *Edward Valves,* we disapprove of the practice of unconditionally adopting findings submitted by one of the parties to the litigation, we affirm our holdings that the findings must be tested by the standard of review mandated by Rule 52.

### III.

■ Federal statutes delineate specific requirements for patentability. Relevant to the present case are the requirements that the patented invention be "new and useful" [3] and "non-obvi-

ture, or composition of matter, or any new and useful improvement thereof, may obtain a patent therefor, subject to the conditions and requirements of this title.
35 U.S.C. § 101.

ous".[4] In addition, a statutory presumption governs this Court's review of patent validity. "A patent shall be presumed valid. The burden of establishing invalidity of a patent shall rest on a party asserting it." 35 U.S.C. § 282.[5] The presumption of patent validity is rebuttable. *See* 35 U.S.C. § 282; Radio Corp. of America v. Radio Engineering Laboratories, 1934, 293 U.S. 1, 55 S.Ct. 928, 79 L.Ed. 163.

The courts, however, have not distinguished themselves for consistency in their determination of the quantum of proof necessary to rebut the presumption.[6] . . . We do not attempt to resolve this apparent inconsistency. Rather, we state that the presumption of patent validity may be rebutted only by a quantum of proof—whether it be called clear and convincing or beyond a reasonable

---

A person shall be entitled to a patent unless—

(a) the invention was known or used by others in this country, or patented or described in a printed publication in this or a foreign country, before the invention thereof by the applicant for ·patent, or

(b) the invention was patented or described in a printed publication in this or a foreign country or in public üse or on sale in this country, more than one year prior to the date of the application for patent in the United States, or

(c) he has abandoned the invention, or

(d) the invention was first patented or caused to be patented by the applicant or his legal representatives or assigns in a foreign country prior to the date of the application for patent in this country on an application filed more than twelve months before the filing of the application in the United States, or

(e) the invention was described in a patent granted on an application for patent by another filed in the United States before the invention thereof by the applicant for patent, or

(f) he did not himself invent the subject matter sought to be patented, or

(g) before the applicant's invention thereof the invention was made in this country by another who had not abandoned, suppressed, or concealed it. In determining priority of invention there shall be considered not only the respective dates of conception and reduction to practice of the invention, but also the reasonable diligence of one who was first to conceive and last to reduce to practice, from a time prior to conception by the other.

35 U.S.C. § 102.

4. A patent may not be obtained though the invention is not identically disclosed or described as set forth in section 102 of this title, if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains. Patentability shall not be negatived by the manner in which the invention was made.

35 U.S.C. § 103. *See* Graham v. John Deere Co., 1966, 383 U.S. 1, 86 S.Ct. 684, 15 L.Ed.2d 545.

5. See Kardulas v. Florida Machine Products Co., 5 Cir. 1971, 438 F.2d 1118; Metal Arts Co. v. Fuller Co., 5 Cir. 1968, 389 F.2d 319.

6. Citing Kardulas v. Florida Machine Products Co., 5 Cir. 1971, 438 F.2d 1118 ("clear and convincing . . . a mere preponderance of the evidence is insufficient . . . beyond a reasonable doubt") ; V. & S. Ice Machine Co. v. Eastex Poultry Co., 5 Cir. 1971, 437 F.2d 422 ("competent evidence") ; Stamicarbon, N.V. v. Escambia Chemical Corp., 5 Cir. 1970, 430 F.2d 920 (reviewing all the standards and approving the use of the beyond-a-reasonable-doubt standard) ; Kiva Corp. v. Baker Oil Tools, 5 Cir. 1969, 412 F.2d 546 ("beyond a reasonable doubt . . . clear and convincing") ; Metal Arts Co. v. Fuller Co., 5 Cir. 1968, 389 F. 2d 319 ("clear, satisfactory, and, by some it is said beyond a reasonable doubt") ; Zero Mfg. Co. v. Mississippi Milk Producers Assoc., 5 Cir. 1966, 358 F.2d 853 ("strong rebuttal") ; Southern Implement Mfg. Co. v. McLemore, 5 Cir. 1965, 350 F.2d 244 ("beyond a reasonable doubt") ; Samuelson v. Bethlehem Steel Co., 5 Cir. 1963, 323 F.2d 944 ("Any reasonable doubt will be resolved against the party alleging the invalidity of a patent") ; Fairchild v. Poe, 5 Cir. 1958, 259 F.2d 329 ("beyond a reasonable doubt") ; Zachos v. Sherwin-Williams Co., 5 Cir. 1949, 177 F.2d 762 ("beyond a reasonable doubt").

doubt—which is greater than a mere preponderance of the evidence. One who seeks to rebut the presumption bears a heavy burden.

Hobbs v. United States, 5 Cir. 1971, 451 F.2d 849, 856.

The district court held that the Railex patent was invalid because (1) the patented system was anticipated by the prior art, *see* 35 U.S.C. §§ 101–102, (2) the patented system did not result from "invention", *see* 35 U.S.C. § 103, and (3) the patented system was not invented by the patent holder, *see* 35 U.S.C. § 102.

Railex argues that the conveyor-dispatcher system represents a significant improvement over the prior art and is, thus, patentable under the statutory standards. The most pertinent prior art is, according to Railex, the chain-hook dispatcher, a motor-driven chain carrying depending hooks spaced several feet apart. Railex contends that this device is noisy because of many moving parts, limited in its capacity because of the spacing between hooks, difficult to load because the relationship between hook and station is difficult to discern, and inefficient because of the wasted time inherent in the gaps between hooks. The system patented by Railex, because of alleged improvements on prior art, is not noisy, allows for increased capacity, is easily loaded, and is more efficient. This is so, Railex argues, because of the duality of function performed by the links—each link embodies a complete set of fingers and constitutes part of the chain—and the interconnection of the links. The noise is reduced because there are fewer moving parts; capacity is increased because there are more, closely-spaced hooks; loading is easy because the operator can easily discern the hook corresponding to the desired station; and efficiency is increased because the operator always has one of the interconnected hooks before him. As appellant—correctly, we think—asserts:

> The heart of the patented invention is in the configuration of the links and the interconnection between them.

The links perform the dual function of constituting the chain, as there is no interconnecting member between them, nor are the links carried by any other member; the links also serve the function of carrying the garments on one of the fingers to the particular station identified by the level of that finger. The link is free of any moving parts and is, therefore, noiseless.

Further, by reason of its unique shape, each link includes a complete series of fingers which can be readily apprehended by the operator at a single glance. The operator is thus provided with a complete "map" of the plant since each finger represents to her one of the several stations to which garments can be dispatched.

Because the links are directly connected together so that there is no space between them, the operator *always* has a link in front of her. The significant advantage of this feature of the patented system is that the operator is never required to wait for the appropriate finger to arrive; it is always there before her on each link. Thus, placing a garment on the correct finger for dispatch to the appropriate operating station is reduced to utter simplicity, permitting the more efficient use of unskilled labor.

The patented system is simple, relatively noiseless, relatively inexpensive to manufacture and maintain, and extremely efficient. Its capacity to dispatch to many widely separated stations is substantially greater than any of the prior systems, and, significantly, the patented system may be loaded at any station for dispatch to any other station. These singular advantages of the patented conveyor are responsible for its being the only commercially successful system on the market, and the standard of the industry.

■ The district court held: "None of the elements or principles revealed or employed in the patent were novel.

None of the elements or principles revealed or employed in the patent are employed or used in any novel manner, nor do they produce any novel or unexpected result." We agree. First, "a conveyor comprising an endless rail, article carrying means mounted for movement longitudinally along said rail and comprising an endless series of rigid links disposed in end-to-end relation and pivotally connected to each other at their respective adjacent ends for pivotal movement in vertical and horizontal planes" is not "new" within the meaning of the patent statute. *See* 35 U.S.C. § 101–102. The patent office cited No. 2,661,828 to Vogt,[7] No. 2,953,240 to Nigrelli, No. 2,609,083 to Leach, and No. 2,899,072 to Weiss[8] in rejecting this element of the patent. These patents reveal a conveyor comprising an endless rail with article carrying means mounted for movement longitudinally along the rail. The patent to Weiss (see foot-

7. 1. A selective conveyor system adapted to suspend and transport a series of loaded bags or the like having suspension means and adapted to discharge the loaded bags at a plurality of pre-selected discharge stations, said conveyor system comprising a conveyor rail, a plurality of trolleys, a conveyor cable connected in common the trolleys and adapted to advance the same along the rail, each of said trolleys having a pair of vertical hangers secured along opposite sides thereof, said hangers having upper ends straddling said rail and having lower ends extending below the trolley, respective rollers journalled upon the upper ends of said hangers and tracked upon the opposite sides of the rail, whereby the trolleys are suspended from the rail, a carrier strap having an upper end interposed between and pivotally connected to the lower ends of said hangers upon an axis disposed at right angles to the cable, each of said straps having a cantilever extension at its lower end extended generally on a horizontal axis forwardly in the direction of conveyor advancement and adapted to engage the suspension means of the bag during transport, a respective trip bar secured to each of said carrier straps in a plane intermediate its pivotally mounted upper end and said cantilever extension, each of said trip bars extending transversely from the opposite sides of the strap and at right angles to the direction of advancement, the trip bars being of successively increasing length from the leading toward the trailing trip bars as determined by the direction of conveyor advancement, a series of stationary skid members mounted in spaced pairs along said conveyor rail, each pair of skid members being spaced apart transversely to the direction of conveyor advancement, said spaced skid members being of substantial length and having parallel upper edges inclined upwardly in the direction of conveyor advancement, said edges being disposed in the path of advancement of the trip bars and being arranged in successively decreased spacing in the direction of advancement and related to the increasing length of the trip bars to provide selective discharge stations, said edges being adapted to provide clearance for the passage therebetween of trip bars which are shorter than said spacing and adapted to intercept the opposite ends of related trip bars which are greater in length than said spacing, said inclined upper edges being adapted to cam the related trip bar upwardly and to partially sustain the weight load of the suspended bag with the carrier strap stabilized laterally during advancement of the trip bar along said inclined edges, whereby the advancement of the trolley by said cable is effective to swing said carrier strap progressively to an angular position causing the suspension means of the bag to slide from said cantilever extension at the discharge station.

No. 2,661,828 to Vogt, Claim 1.

8. 1. A conveyor rack for storing material subject to selection and removal therefrom comprising an endless track, a rack rail structure to carry stored material said rack rail structure comprising a series of frame members pivotally interlinked in end to end relation to provide a continuous assembly thereof, means to suspend said frame members from the track for movement around the latter, a rack rail section dependent from each frame member, for disposition in downwardly spaced parallel relation thereto said rack rail sections being also disposed in end to end relation with adjoining ends lapping one over the other, and the overlapping end of each rack rail section being chamfered whereby the end to end assembly of said rack rail sections provides a continuous slick rail adapted to permit unobstructed adjustable movement thereover of stored material carried thereby.

No. 2899,072 to Weiss, Claim 1.

note 8) and the patent to Nigrelli reveal a conveyor comprising an endless series of rigid links connected end-to-end and allowing for movement in vertical and horizontal planes. No. 865,263 to Moe,[9] No. 1,874,042 to Hoefen,[10] and No. 2,897,951 to Jonson [11] are also pertinent prior art revealing this element of the Railex patent. In addition, certain "call-office" conveyors, not made known to the patent office examiner, were introduced at trial in the district court. These conveyors too anticipate this element of the Railex patent. The district court held:

A conveyor comprising an endless rail with article carrying means mounted for movement longitudinally along the rail and comprising an endless series of rigid links disposed in end-to-end relation and pivotally connected to each other at their respective adjacent ends for movement in vertical and horizontal planes, a plurality of said links being disposed in a vertical plane, as described in the patent was not a novel revelation.

This finding is not clearly erroneous.

Second, the next element of the patented system—"a plurality of said links each having each link being disposed in a vertical plane, a similar series of article carrying hooks integral with the companion link and spaced from each other longitudinally of said rail, at least a pair of said hooks of each link being at different levels, respectively"—is not "new" as is required by the patent stat-

---

9. 1. In a conveyor stripper, a conveying device, a goods support carried thereby, and a movable stripper mounted upon a part fixed relative to said conveyor and actuated by said conveyor to remove the goods therefrom.

\* \* \* \* \* \* \*

11. In a conveyor stripper, a track, a carrier wheel supported therefrom, a conveyor chain carried by said wheel, a depending hanger from said chain having lateral projections therefrom, a goods support at the lower end of said hanger, a yoke carried by said track, a stripping device carried by the lower end of said yoke and adapted to engage the lateral projection of said hanger, a goods supporting hook carried by said hanger and extending in the direction of the length of the chain, a stripperhead slotted to embrace said hook, an operating head carried by said stripper between the yoke members, and a guide plate inwardly inclined to dispose said hanger in the path of said head.

10. 1. Conveyor mechanism of the class described, comprising the combination with a guard rail and a trolley rail, of a conveyer chain running along said guard rail and comprising a plurality of links, of which selected links have a body portion provided with lateral extensions thereon, a roller within the body portion adapted to roll along the guard rail, the selected links being interconnected with the remaining links by means of the said lateral extensions of the said body portion the said selected links including means for suspending the chain from the trolley rail.

No. 1,874,042 to Hoefen, Claim 1.

11. 1. A conveyor for the conveying of suspended articles comprising a conveyor track, a plurality of conveying members spaced along a conveyor chain and movable in series along and suspended from said track, a plurality of stations in spaced predetermined positions along said conveyor track, each of said conveying members having a plurality of carrying elements upon any one of which an article may be suspended to be carried by said conveying member as the latter moves along said track, each of said carrying elements in each of said conveying members comprising a spindle rotatably mounted in said conveying member and having a finger projecting obliquely to the axis of rotation thereof, each of said spindles being rotable independently of the others of said spindles from a first position in which said finger will extend obliquely upwards to retain an article suspended thereon to a second position in which said finger will extend obliquely downwards thereby an article carried thereby will be released for discharge from said finger under the influence of gravity, and means in at least certain of said stations for rotating solely one of said spindles from said first position to said second position whereby to discharge in said station any article which may be suspended by said one finger.

No. 2,897,951 to Jonson, Claim 1.

ute. Patent No. 2,834,475 to Reich,[12] No. 865,263 to Moe (see footnote 9), and the "call-office" conveyors reveal article carrying hooks integral with the article carrying means. Also relevant are the patents to Vogt (see footnote 7), to Jonson (see footnote 11), and French Patent No. 1,131,860. The district court's finding that "[i]t was not novel to provide that the links of the conveyor sould serve a dual function of providing a drive chain and of serving as article carrying means" is not clearly erroneous.

Finally, the article removal means— "[a] series of longitudinally spaced operating means positioned along the path of movement of said hooks for article removal operation with selected ones only of said hooks for selective removal of the articles carried thereby, one of said operating means being at a level corresponding to the level of one of said hooks of each of said pairs of hooks of each series of hooks and in position for operation with respect to said one hook only, and another of said operating means being at a different level corresponding to the level of the other of said hooks of each of said pairs of hooks of each series of hooks and in position for operation with respect to said other hook only"—is not novel. The principle of providing selective discharge from a conveyor by varying the heights of the carrying elements of the conveyor so as to correspond with the height of an independent article removal device is illustrated by No. 1,308,391 to Bell,[13] and No. 386,314 to Green.[14] Nor is the principle of ar-

12. A carrier for holding and transporting a group of garment hangers as a unit on a supporting rail, comprising upright flexible yieldingly separable side plates spaced to stand at opposite sides of a supporting rail and having horizontally aligned bearing openings disposed to stand above and at opposite sides of the center of the supporting rail, a roller confined between said side plates having projecting spindles at opposite ends rotatably and removably engaged in said bearing openings and having a midlength located, circumferentially extending annular V groove reversely faced conical surfaces effecting engagement of the roller with the top of the supporting rail at opposite sides of the rail center for centering the roller and supported structure and for holding the same against twisting on supporting rails of different diameters, said side plates having spaced apart portions extending below said roller and supporting rail center having laterally separated horizontally extended transverse notches for receiving garment hanger hooks in spaced relation to maintain garment hangers laterally separated and whereby said carrier may be engaged on or be removed from different supporting rails on springing the flexible side plates apart to release the spindle extensions of the roller and whereby said V grooved roller will hold the carrier against twisting or turning on the rail and the horizontally extended hanger hook notches will hold the garment hangers against twisting or turning on the carrier.
No. 2,834,475 to Reich, Claim 1.

13. 1. In an article distributing system, a plurality of points to which articles are to be distributed, means for conveying the articles to said points, a plurality of contact springs at each point so connected as to electrically distinguish certain points from other points, a plurality of plungers individual to said article conveying means, means for rendering said plungers responsive only to the electrical condition existing at certain given points, and means operated by said plungers to release an article from said article conveying means.
No. 1,308,391 to Bell, Claim 1.

14. 1. The cash carrier carriage B and cash-buckets D, combined with the Track A and station hook F, permanently attached to said track and provided with the return bend 4 in a horizontal plane, or thereabout.
2. The combination of the carriage B, provided with retaining stops or abutments for the bails of the cash-bucket, and with the supporting hooks G, having the extended fingers k, with stationary projecting trip-fingers and receiving hooks at the salesmen's stations, all substantially as described.
3. The combination of the carriage adapted for outward and returning trips, having thereon a single gathering hook and a series of delivering hooks,

ticle removal novel. See No. 865,263 to Moe (footnote 9), No. 1,775,545 to Anderson,[15] and British Patent No. 791,-276. The district court correctly found that "[t]he principle of Claim One for the obtaining of selective discharge from a conveyor by providing a carrying element with hooks at different levels to cooperate with article removal means at corresponding levels was not novel."

Conceivably the Railex patent may have been allowed as a combination claim. The history of the patent application reveals that the claims of the patent were rejected on four occasions; each element was held to be anticipated by the prior art. Only when the applicant argued patentability of a "combination" was the patent allowed.[16] The allegedly patentable combination, however, as well as the allegedly novel result produced by that combination, are anticipated by the prior art, including No. 2,897,951 to Jonson (see footnote 11), No. 1,775,545 to Anderson (see footnote 15), and No. 2,872,057 to Wagner.[17] *See* Machine Co. v. Murphy, 1878, 97 U.S.

120, 24 L.Ed. 935; United States v. Adams, 1965, 383 U.S. 39, 86 S.Ct. 708, 15 L.Ed.2d 572; Sterner Lighting Co. v. Allied Electrical Supply Co., 5 Cir. 1970, 431 F.2d 539. We agree with the finding of the district court:

> The combination of old elements and principles employed in the patent does not employ such elements and principles in a novel or unusual manner nor do the elements perform a function different than theretofore performed, nor does the combination perform in a novel and unexpected manner to produce a novel and unexpected result.

*See* Great Atlantic & Pacific Tea Co. v. Supermarket Equipment Co., 1950, 340 U.S. 147, 71 S.Ct. 127, 95 L.Ed. 162.

The findings of the district court as to the lack of novelty in the elements of the Railex patent and the combination of those elements are not clearly erroneous. Substantial evidence supports the district court's conclusion that the conveyor-dispatcher was anticipated

each situated and moving in a different line from the others, the cash-buckets, the receiving hooks at the several stations situated correspondingly to the delivery hooks, graduated trip-fingers, and a series of supporting hooks, one at each station, in line with the single gathering hook, all substantially as described.
No. 386,314 to Green, Claims 1, 2 and 3.

15. The combination with a moving carriage, of an article support suspended therefrom and comprising cooperating members normally locked against premature release, and means for actuating said members to selectively release the article support therefrom at a predetermined point in the travel of the carriage, said means comprising independently movable abutments positioned to be engaged by said side members.
No. 1,775,545 to Anderson, Claim 1.

16. Railex argued before the Patent Office:
Applicants have invented a new and patentable combination which produces new and unobvious results, namely the continuous loading and automatic distribution of a plurality of different ar-

ticles to different locations, wherein the conveyor construction is such that a series of article carrying members are always present to enable the operator to place the article on any one of the series of members for proper dispatching of the article to a particular location. The references fail to disclose or suggest the claimed combination.

17. 1. A mechanism for loading a plurality of units onto and unloading said units from a powered conveyor system, said mechanism including an endless conveyor carrying a plurality of carrier units, each unit comprising a hanger and a multi-tray member secured thereto, a plurality of loader units mounted along the endless conveyor each of said loader units handling a certain type of article to be transported on a certain tray of the multi-tray member, and a plurality of corresponding unloader units mounted along the endless conveyor remote from the loader units, said loader and unloader units including control means actuated by the hangers for effecting an energization of the latter units.
No. 2,872,057 to Wagner, Claim 1.

by the prior art.[18] Because we agree with the district court's conclusion as to the invalidity of the Railex patent, we need not and do not reach the secondary tests of non-obviousness, (*see* Graham v. John Deere Co., 1966, 383 U.S. 1, 86 S.Ct. 684, 15 L.Ed.2d 545), the defense of prior inventorship, or the issue of infringement.

Affirmed.

18. As to any arguable novelty in the Railex system or the results produced by that system, the district court held:

The substitution of a link of integral hooks of different levels for the links of a "call-office" conveyor and the providing of article removal means at corresponding levels is an exercise only of such mechanical skill as a trained mechanic in the field would be expected to possess.

Such substitution of such link and the providing of such article removal means in the light of the prior art known at the time would be obvious to any trained mechanic in the field.

The bringing together of the article carrying means for the hooks, as employed in the Standard Industrial plant, and the fusing of such article carrying means into a single link and the joining together of such links "at their respective adjacent ends for pivotal movement in vertical and horizontal plane", if such were desired, would be an exercise of only such mechanical skill as a trained mechanic in the field would be expected to possess and such would be obvious to any trained mechanic in the field in the light of the prior art.

These finds are not clearly erroneous and are supported by the evidence.