**WHITEHALL CORPORATION, Plaintiff,**

v.

**WESTERN GEOPHYSICAL COMPANY OF AMERICA and Litton Resources Systems, Inc., Defendants.**

Civ. A. No. H–79–786.

United States District Court,
S.D. Texas,
Houston Division.

July 10, 1986.

Robert W. Turner, Hubbard, Thurman, Turner & Tucker, Dallas, Tex., for plaintiff.

Gary V. McGowan, P.C., Robert A. Rowland, III, Susman & McGowan, Houston, Tex., Elwood S. Kendrick, Kendrick, Netter & Bennett, Los Angeles, Cal., for defendants.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

DeANDA, District Judge.

Pending before the Court is a suit for patent infringement. Plaintiff Whitehall Corporation (hereinafter "Whitehall") alleges that Defendants Western Geophysical Company of America (hereinafter "Western") and Litton Resources Systems, Incorporated (hereinafter "Litton") have copied, manufactured, used, and sold to third parties Whitehall's patented seismic streamer system with an elastic section to attenuate noise and vibrations during exploration for underwater oil deposits. Whitehall's claim for damages under 35 U.S.C. § 284 has been bifurcated from the present action to determine liability. Whitehall's claims infringement, literally and under the doctrine of equivalents, of U.S. Patent No. 3,319,734 and seeks damages for the six years prior to and for an

undetermined period after the filing of this suit on April 13, 1979. Additionally, Whitehall requests a permanent injunction enjoining Western and Litton from continuing infringement and from inducing others to do the same.

Western and Litton counterclaim for a declaratory judgment that the patent is invalid, not infringed, and unenforceable by reasons of prior art, obviousness, and inequitable conduct in nondisclosure before and during the prosecution of the Pavey patent. They accordingly request attorney's fees for an exceptional case under 35 U.S.C. § 285. Alternatively, if the Court finds the patent valid, they interpose defenses of laches and estoppel. They further counterclaim that Whitehall damaged them by tortious interference with their contractual business relations and by unfair competition under Texas common law.

Following trial of this suit upon the facts to the Court and after considering the evidence and the record, the Court hereby enters the following findings of fact and conclusions of law pursuant to Rule 52(a), Fed.R.Civ.P. The Court concludes that the disputed patent is invalid and unenforceable for obviousness, for prior use, and for inequitable conduct during prosecution of the patent. However, in its equitable discretion, the Court denies an award of attorney's fees under § 285. The Court also finds that the actions of Whitehall did not constitute tortious interference with Western's property rights in its business contracts.

## FINDINGS OF FACT

1. Whitehall is a Delaware corporation having its principal place of business in Dallas, Texas. Whitehall, as the alleged inventor's assignee, owns U.S. Patent No. 3,319,734, entitled "Elastic Detection Streamer Dead Section for a Borne Seismic Surveying System" (hereinafter "the Pavey patent"), issued on May 16, 1967 to George M. Pavey, Jr., as the inventor.

2. Whitehall, as Pavey's assignee and owner of the Pavey patent, has standing to maintain this action under 35 U.S.C. § 282.

3. Western and Litton, both subsidiaries of Litton Industries, Inc., are Delaware corporations having regular and established places of business at Houston, Texas and Alvin, Texas, respectively. Western is a large marine seismic operator in oil exploration, while Litton manufactured the disputed seismic streamers for use by Western and for sale to third parties.

4. Whitehall, with the aid of its manufacturing subsidiary Seismic Engineering Company, competes with Western and Litton in supplying services and equipment for offshore seismic surveying in oil and gas explorations.

5. Whitehall filed this action on April 23, 1979, charging Western and Litton with infringing the Pavey patent for the previous six years and for continuing infringement. *See* conclusion of law (hereinafter "CL") 16.

6. The purpose of a seismic streamer with hydrophones is to receive, after a large charge is set off, any refracted acoustic signals, such as seismic echoes, to determine geologic formations on the ocean floor.

7. The major progenitor of the Pavey conception was the Paslay streamer, patented in 1949. LeRoy C. Paslay invented it for use by a partnership consisting of himself, George M. Pavey, Jr. (inventor of the Pavey patent), and Frank Wipff. Pavey ultimately became the sole head of the business, known as Seismic Engineering Company (hereinafter "Seismic") at the time that it was acquired by Whitehall in early 1965. Pavey became president of Whitehall for five years and then stepped down to become a director and vice president of Whitehall and the chairman of the board of Seismic.

8. The Paslay streamer was a long, multichannel, waterborne streamer with three steel cables and electrical conductors running throughout, separated into modules: live, submerged detection sections (equipped with hydrophones), dead sections to isolate the live sections from the tow cable's vibration noise, and a tow cable. Although the Paslay patent did not expire until March, 1966, by 1964 it was inade-

quate for industry needs, despite substitutions of updated hydrophones. By then the demands of environmentalists forced the seismic exploration industry to employ sources of less intense but more frequent sound waves, e.g., air or gas guns, instead of the high explosives used previously. As a result, it became necessary to maximize the reflected signal to background-operating-noise ratio and to provide a means for continuous reception of refracted sound waves. The Paslay dead sections were unable to resolve sufficiently the problem of reducing operating noise during continuous, high speed towing. To compensate, the boats had to let out cable while moving, then stop, reel the cable in, and start up again, a procedure known as the "yo-yo" technique.

9. From 1962–64, Pavey's company, Seismic, supplied to Geophysical Service Inc. (hereinafter "GSI"), a subsidiary of Texas Instruments (hereinafter "TI"), one-inch, clear plastic, oil-filled seismic surveying cables with dead sections containing internal nylon-cord strain members, as well as spacers and electrical conductors, to dampen noise and shock from the towing vessel during continuous towing. They were single-channel, short streamers of several hundred feet, equipped with a multiplicity of geophones and used with gas guns as sound sources, for commercial oil exploration in United States waters. The data retrieved was sold to oil companies and aided in the discovery of significant oil deposits, one still productive today. Raymond Hicks, Pavey's patent attorney, was unaware of this business activity, as was the Patent and Trademark Office (hereinafter "PTO") examiner during the subsequent prosecution of the patent. Pavey produced the invoices for these streamers only after several requests from Western and Litton's attorneys.

10. After continuing to experiment with elastic dead sections during the summer of 1964, Pavey applied for his patent on June 17, 1965, less than a year before the Paslay patent, on which it was based, was to expire and shortly after Whitehall purchased Seismic. For the purposes of the statutory bars of public use and prior sale, the critical date is June 17, 1964.

11. The alleged inventiveness of the Pavey improvement patent lies in its use of nylon strain cable ropes, as Pavey acknowledged. More effectively than Paslay's comparatively stiff and stable dead sections, Pavey's elastic section (or vibration isolation module), encased in flexible plastic tubing, isolates and attenuates noisy tow-cable vibrations from affecting the first live section, without adding new noise, by the use of nylon rope. Both Paslay and Pavey dead sections simultaneously transmitted the towing force and the electrical hydrophone signals. The Pavey elastic section permits the use of much larger streamers at significantly reduced noise levels and at a uniform, high towing speed, while reducing wear on the equipment.

12. In his application to the PTO, Pavey did not disclose any prior art references to streamers with elastic sections intended to be used with low energy sound sources during continuous, relatively high speed towing.

13. Although Pavey's application did not specify a rope made of nylon, the examiner of the PTO initially and expressly rejected the Pavey application as a use of nylon cable in an obvious combination of the Pasley patent and the Mundy patents; thus, as part of the file wrapper, nylon becomes a factor in construing the patent. The examiner incorrectly stated that the Paslay patent's steel dead section had an elastic coupling; actually, it used steel wire, which transmits tow-cable vibrations and noise. The Mundy patent taught the use of an "anti-hummer" elastic hose to connect the trailing end of the tow cable with the leading end of a hydrophone-detector section. Pavey amended the claims to limit and define the scope of his elastic section in light of the prior art cited against it by introducing the concept of a plurality of plastic strain cable that were "longitudinally estensible", compared to Paslay's dimensionally stable steel cable for maintaining precision spacing. The examiner approved his application and issued a patent on May 16, 1967, which Pavey

assigned to Whitehall. The Pavey patent expired on May 16, 1984.

14. As president of Whitehall, Pavey saw a newsletter describing TI's manufacture of cables with stretch sections. In a letter dated July 10, 1967, Whitehall inquired if TI wished to take out a license under the Pavey patent. After investigating, TI questioned the validity of the patent in a letter dated January 3, 1968 and claimed that it had disclosed to Pavey in 1962 or 1963 that it had an isolator section for which it was soliciting bids. Whitehall and Pavey never pursued the matter either through a further search for proof or through a lawsuit, although Whitehall had the financial resources to do so.

15. The Pavey streamer entered the marketplace in 1965 and achieved sufficient commercial success to indicate an industry need for the device. Whitehall sold about fifty million dollars worth of equipment that incorporated Pavey's elastic section and sold no seismic streamers without it. Several of Whitehall's competitors, including TI's subsidiary GSI, stopped their seismic-streamer research projects and bought the Pavey streamer. GSI explained that the multichannel streamer produced and processed data more efficiently than its single-channel device and that purchasing permitted GSI to concentrate on seismic operations without being diverted into manufacturing streamers to supply its needs. Among other Pavey-streamer purchasers was Western, which bought cables from Seismic from 1966 until 1972, when Western started manufacturing copies of the patent in suit.

16. Whitehall sold a large number of streamers incorporating the Pavey elastic section during the 1960's and early 1970's to Western. Before 1972, Western, with Whitehall's knowledge and aid in training employees, began its own repair work and established a repair facility in Galveston, Texas.

17. Determined to become a self-supplying, economically efficient company, Western built another facility on Galveston's Pelican Island. Here in 1972, Western began to manufacture streamers substantially identical to those disclosed in the Pavey patent which it had been buying from Whitehall and Seismic. Western made no efforts and spent no money to research and develop a new cable or stretch section from 1972 until this lawsuit was filed in 1979, when it designed around the Pavey patent sufficiently to avoid infringement. The initial plagiarism of the Pavey streamer system was achieved partially by Western's hiring of key cable-makers previously employed by Whitehall and Seismic and partially by the knowledge Western's employees gained through repairing streamers purchased from Whitehall. In 1972, Western unsuccessfully attempted to hire Seismic's foreman, J.W. Ferguson, but did obtain the services of his assistant, Mancel "Buddy" Beam, specifically to aid Western to begin cable manufacturing. The loss of Beam, a key employee, was common knowledge in Seismic's cable shop and known to Whitehall officers, including President Lee Webster and Pavey, himself. Western also hired Beam's replacement at Seismic, supervisor Fred King. Other employees moving from Seismic to Western included the Carrera brothers, Romero Garcia, who built hydrophones, and a Mr. Wadsby. Western also offered a job to Seismic's Ray Pearson, inventor of the Multidyne hydrophone, the industry's favorite hydrophone sold exclusively by Seismic for use in its streamers. In 1974 Ferguson changed his mind and also went to work in Western's Galveston facility for seven months.

18. Western and Litton bought their last elastic section from Whitehall in December 1973. In 1974 they expanded their facility in Galveston and began selling seismic streamers to third parties. In 1979 Western opened a large facility in Alvin, Texas, only partly for the manufacture of elastic sections. At the time this lawsuit was filed, giving Western actual notice of infringement, a third of the slab had been poured and the steel erection had not begun. The building was finished and was occupied six months later. Subsequently, in response to the filing of this action asserting Whitehall's patent rights, Western and Litton changed the design of their dead section to utilize a single, double-braid ny-

lon rope with no spacers instead of Pavey's three ropes with lucite spacers.

19. Other competitor-companies apparently manufacturing their own streamers and possibly infringing the Pavey patent during the 1970's include PRAKLA, GECO, GSI, Teledyne Exploration and Cable X.

20. In May 1972 Western began purchasing increasing numbers of Whitehall's Multidyne hydrophones and hydrophone mounts, used in the live but not in the elastic sections of the streamers. Hydrophones and mounts are generally not needed to repair streamers, since they are expensive and can be salvaged from worn out cables because of their greater durability. In November 1973, Esso requested bids from Whitehall and Western, among others, for a seismic streamer but specified that Multidyne hydrophones, manufactured exclusively by Whitehall, be used in it. In December or January, Western outbid Whitehall on the contract. Whitehall learned of Western's success in January 1974 but did not give Western written notice of the existence of the Pavey patent. However, Whitehall refused to provide enough hydrophones to Western to meet the project's requirements, so Western turned to the less expensive Crump hydrophones to fulfill the Esso contract. Furthermore, in a letter dated January 11, 1974, Seismic informed Western that future orders for Multidyne hydrophones had to include a statement that the hydrophones would not be used in streamers intended for sale to third parties. Western refused to agree to such a covenant. Subsequently, Seismic resumed selling hydrophones to Western without restrictions. Later Western bought Houston Products, the manufacturer of Crump hydrophones, and thereby became capable of supplying its own phones to customers willing to buy them in place of the Multidyne hydrophones. There is conflicting testimony among Western's officers and employees as to whether the changeover proved substantially detrimental to either the Esso project or, in the long view, to Western's business success, since the Crump phones saved Western money while the purchase of Houston Products allowed the company to become independent. Under this record, the Court finds that there was not damage.

21. Personal problems plagued Pavey throughout the period of suspected infringements. His first son and his mother died in 1967, while his second son was killed in an automobile accident in 1970. In October 1973, Pavey's wife was diagnosed with what became terminal cancer. Relieved of his duties at Whitehall, he cared for her until she died in August 1978. After Pavey's return to business, Whitehall filed the present action on April 23, 1979. Whitehall explains that its delay in enforcing its patent rights was due to Mrs. Pavey's illness, which necessitated Pavey's absence from company affairs. *See* CL 17(a)(3).

22. Whitehall gave no actual notice of its intent to pursue its patent rights against Western and Litton as possible infringers until it filed suit. Subsequently, on June 14, 1979, Whitehall sent letters putting approximately eighteen other companies on notice of patent infringement and of the pending suit against Whitehall.

23. In 1979 at the Offshore Technology Conference, Pavey received an award for outstanding achievements in the field of marine seismic streamers.

24. While evidence and testimony of witnesses indicated that the nine claims of the Pavey patent were found in or obviously suggested by the prior art, they did not establish through clear and convincing evidence a single reference that anticipated all of the claims as required under § 102. Material differences are apparent between the claimed invention and each of the more pertinent anticipatory references relied upon by Western and Litton. *See* CL 7.

a. The Mundy patent (U.S. Patent No. 793,896, issued in 1905) taught a single hydrophone isolated from its towing cable by a rubber hose, unlike the multichannel Pavey streamer, several thousand feet long, with an elastic section encased in vinyl to reduce noise and strum.

b. The Paslay patent (U.S. Patent No. 2,465,696, issued in 1949), and the Paslay streamer as it was modified to meet chang-

ing needs, disclosed an oil-filled dead section utilizing three steel cables connected to the tow line from the vessel and to a submerged seismic streamer. The use of three steel cables contrasts with Pavey's employment of three nylon strain members. The Paslay streamer used hollow Lucite spacers, while Pavey's employed solid spacers. Paslay's dead section served primarily to maintain spacing, although it did contribute secondarily to noise attenuation, while the central purpose of Pavey's elastic section was noise and vibration attenuation.

c. The Loper patent (U.S. Patent No. 3,369,216, applied for in 1963 and issued in 1968) a buoyant marine system used under continuous towing that was made up of a tow vessel, a tow cable, a depressor-isolator section to reduce noise transmission from the tow cable, and a detection streamer with a plurality of detecting devices. The depressor-isolator section is a hollow container with apertures that fills with and discharges water during towing and reduces the transmission of noise from the tow line to the detector streamer by means of a resilient, two-strain shock or bungee cord or by means of a spring. The disclosed streamer is only several hundred feet long, and the patent does not teach a nylon rope nor an oil-filled dead section. The Loper patent was dedicated to the public, permitting practice without concern for a patent's seventeen-year period of monopoly.

d. The Mobil SUE (seismic underwater explorer) two-inch cables, with nylon tow rope and internal members, did not use elastic sections but a rubber cable on single-channel streamers about three hundred feet long. There were breakage problems with the rubber towing cable. As reconstructed by the testimony of Jack Profitt, one Mobil SUE project on the West Coast of the United States around 1962 used a nylon tow cable; a conventional, oil-filled, steel-member Paslay dead section to limit noise; and an acoustic streamer made by Seismic. It was used commercially with a propane gun under continuous towing to record data then sold to oil companies.

e. The Estes patent (U.S. Patent No. 2,979,015, issued in 1961) revealed a towed, anti-torpedo, sonar system that detects and destroys a moving target in response to signals from detecting microphonic devices, a different functional purpose from that of the Pavey streamer system. It towed a plurality of streamers in a set, spaced arrangement. These streamers consisted of a plurality of flexible tubes with multiple microphonic devices electrically connected to the vessel through the tow line. Unlike the Pavey and Paslay's oil-filled cable, Estes maintained neutral buoyancy by air pressure in its inflated streamers.

f. GSI's one-inch, clear-plastic-jacketed SUE cables with slack electric conductors, used with non-dynamite sound sources under continuous towing for commercial work during the early 1960's, had the same configuration as the Pavey streamer: a tow cable; a dead stretch section with a single, internal, nylon-cord stress member for isolation purposes; and a live acoustic section with hydrophones and spacers. They were designed and supplied by Pavey's company, Seismic. Unlike the Pavey system, they were single-channel, short streamers.

g. Chesapeake Instrument Corporation experimented with different VIMS (vibration isolation modules). One consisted of a towed array with hydrophones encased in a rubber hose embedded with nylon that provided structural rigidity and reduced compliance, in contrast to Pavey's use of an internal, flexible and stretchable nylon strain member. The Chesapeake device had no separate elastic dead section. Another Chesapeake VIM utilized a plurality of bungee cords covered by nylon strands as internal strain members. Chesapeake made no effort to patent its devices, which it considered to disclose a spring within the realm of common knowledge.

h. The Wilcoxon patent (U.S. Patent No. 2,906,992, issued in 1959) teaches a hydrophone in an enclosure that becomes filled with water as it is towed. An elastic sleeve between this enclosure and the towing vessel isolated vibration. The patent discloses as its purpose measuring, rather than filtering out, ship noise. It does not mention

nylon rope, a rubber sheath filled with oil, spacers, or a plurality of seismic detecting devices. It does teach an elastic vibration isolater with slack conductors.

i. TI's marine seismic unclassified experiment under government contracts in 1963 reveals an isolator section with extensible elastic strain cords encased in plastic with spacers, plugs, internal conductors, and metal strain cables. Because of this device, TI refused to take a license under the Pavey patent, and Whitehall did not pursue its infringement claim.

25. Mandatory factual inquiries relevant to the determination of obviousness in regard to patent validity include the scope and content of the prior art, differences between the prior art and the accused patent, the level of ordinary skill in the pertinent art, and objective evidence as indicia of nonobviousness (hereinafter "secondary considerations"). *See* CL 9.

a. The Court finds that the relevant field of prior art encompasses marine seismic streamers as a whole; the Court refuses to narrow that field to multichannel, long streamers of several thousand feet merely to exclude pertinent references from short-streamer prior art. Seismic streamers as a group exhibit continuous development and shared technological advances. A significant portion of materially pertinent art concerning continuously towed, single-channel seismic streamers with elastic isolators was withheld from the PTO during the patent's prosecution. Evidence and testimony indicate that Pavey and Seismic utilized advancements in short streamers in developing the patent in suit. Data compiled by these short streamers with internal nylon strain members supplied to GSI by Pavey and Seismic prior to the critical date were commercially valuable in locating underwater oil deposits, the central goal of the Pavey invention as expressed in the patent's specification. As Western's witnesses have stated, the same scientific principles apply to both long and short streamers. Specific reasons for differentiating long, multichannel streamers from short, single-channel streamers were not demonstrated by Whitehall; general and vague statements about greater weight and drag are insufficient to support a narrower circumscription of the art by the Court, particularly since testimony indicated that the size of the diameter and thus the strength of the nylon rope are and have been readily manipulated to meet the weight of a load. The results of Pavey's carrying over of the structure and principles from Seismic-supplied, GSI streamers to the Paslay streamer were anything but unexpected. Even if the Court narrowed the field, the art of short streamers would constitute a clearly analogous art, presumably known to and utilized by a person of ordinary skill in long streamers for the purpose of determining obviousness. Prior art sonar streamers and towed arrays constitute analogous arts. *See* CL 8.

b. The inventor's problem was the reduction of noise and vibrations from the tow cable during continuous towing of seismic streamers to enable the incorporated hydrophones to pick up refracted seismic echoes created by discharging low energy sources.

c. Collectively, all the elements of the Pavey streamer are by clear and convincing evidence found in or suggested by the prior art and would have been obvious in combination to a person of ordinary skill in the pertinent art at the time of the invention. Pavey admitted that his invention was the substitution of nylon rope for steel cable in the Paslay dead section, and he stated that a qualified scientist, given the concept of selecting an elastic member to isolate vibration, "could sit down and do just what I did."

1. The structure of the "system" taught by the patent in suit was an old configuration with an alleged significant improvement achieved over the extensively used Paslay streamer through the substitution of nylon cable for steel members. The system consisted of a long known, lead-in tow cable, an elastic isolator dead section with allegedly distinctive nylon stretch members, and the known Paslay live section. Although Pavey testified that placement of the spacers distinguishes his streamer from Pas-

lay's, there is no disclosure of any arrangement in the patent.

2. Continuous towing at a relatively high rate was common to several competing streamers.

3. The properties of nylon in a marine environment, in particular its elasticity and strength for vibration and noise attenuation and for towing strength, were known in practical use and in the literature for towing as well as mooring. The equation Pavey used for determining the elasticity of nylon was available in standard physics textbooks in the public domain. Nylon strain members were used in short seismic streamers previously, including those sold to GSI by Seismic. Pavey has asserted that his eye splices to connect the three-lay nylon rope to the steel cables were common knowledge in marine art.

4. Oil-filled, neutrally buoyant sections were employed by many at the time. Pavey did not discover the stability of nylon cable in kerosene.

5. Nylon cable with slack electrical wire for the conduction of signals from streamer hydrophones to a boat was known.

6. Vinyl sheaths to encase, to waterproof, and to streamline the sections were utilized on other cables, including the Mobil SUE.

7. Elastic sections were recognized as a way to attenuate noise and vibrations from the boat and tow cable to the towed, hydrophone-detection streamers.

d. The level of ordinary skill in the art is sophisticated and technical. A person of ordinary skill in the art would have one or more advanced degrees in physics or engineering and probably several years of practical experience in the seismic streamer field and in particular in vibration analysis and attenuation. *See* CL 9.

e. Secondary considerations have little weight in light of the facts of this case. *See* CL 9.

1. In this rapidly developing field, there was no long-felt need, although there was a significant one with the change-over from high explosives to low energy sound sources in the immediate years before Pavey's patent application. A number of companies were experimenting with similar concepts to meet the new requirements. Pavey had a distinct advantage in long-streamer experimentation in that his company still held the monopoly on the Paslay streamer.

2. Commercial success fails to persuade the Court of the patent's validity. Pavey's "system" incorporated Seismic's well established and commercially profitable Paslay streamer, which had already been modified to keep up with the rapid changes of the industry. Whitehall never provided figures comparing sales of the Pavey streamer with the sales of the Paslay streamer. Also, Seismic subsequently patented and incorporated into Pavey's streamer Multidyne hydrophones, highly regarded by the industry. The price of the elastic section is minimal compared with that of the streamer's other components. Thus the streamer's commercial success is not clearly due to Pavey's elastic section. Furthermore, testimony suggests that Seismic's streamers were considered mechanically superior by many in the industry, but it does not necessarily follow that the streamer was a nonobvious invention. William Blakely testified that GSI bought Seismic's streamers to avoid having to divert its resources and energy into manufacturing streamers. Whitehall did not divulge its specific share of the market.

3. Unlike under the Paslay patent, no licenses were taken out under the Pavey patent. A number of companies were experimenting with noise attenuation devices, including TI, which refused, when challenged, to take out a license from Whitehall and also questioned the validity of the patent on the basis of its own prior art. TI openly continued to develop and utilize its own technology without further challenge from Whitehall.

4. Whitehall not only remained silent in regard to TI, but to the industry; the issuance of the Pavey patent was and remained largely unknown in the art,

even among Whitehall and Seismic's own employees. In stark contrast, the patents for the Paslay streamer and for the Multidyne hydrophone, both exploited by Whitehall, were widely recognized and respected. Whitehall did not put patent numbers on the Pavey streamers until after 1972 and then only sporadically. While ignorance of a patent alone will not excuse infringement, Whitehall made no effort to communicate its existence until the filing of this action; it is even reasonable to infer that Whitehall concealed it because of Whitehall's continued failure to apprise Western of its existence in the face of Western's known manufacturing activities. As with TI, Whitehall and Seismic slept on their patent rights.

5. Western's copying is similarly unpersuasive as to patent validity. The copying was by no means immediate, occurring seven years after issuance of the patent, which, as noted, remained strangely unknown given its alleged importance and success. There is no evidence that Western attempted for a substantial period but failed to design a similar device to support nonobviousness. Copying can reflect the mechanical superiority of a readily available product but does not necessarily prove nonobviousness. Copying can also occur because of belief that a patent owner is unwilling or unable to enforce his rights. The record offers only Whitehall's speculations about motive and Western's normal business desire to assure itself of an available and economically efficient supply of streamers that it claimed it did not know were patented but should have during the 1970's.

6. Pavey's award at the 1979 Offshore Technology Conference was decided upon before this suit was filed. Furthermore, there is no indication that the award was for the patent in suit since Pavey had been a contributor and significant force in the industry for over thirty years.

26. Although there can be no liability for infringement of an invalid patent, in the interests of judicial economy the Court finds that all of the claims of the Pavey patent clearly read on the three-rope elastic section copied and manufactured by Western from 1972 until after this suit was filed. Thus the Court finds there was infringement literally and under the doctrine of equivalents of the Pavey patent. *See* CL 15.

27. The Pavey patent complies with the enablement and best mode requirements of 35 U.S.C. § 112. *See* CL 12 and 13.

28. Western's redesigned single-rope elastic section without spacers does not infringe the Pavey patent. File wrapper estoppel precludes the assertion that the patent reads on the single-rope design. *See* CL 15.

## CONCLUSIONS OF LAW

The major legal issues to be decided here are whether the Pavey patent is valid; whether Western and Litton's modification of its design takes their streamer out of the area claimed by the Pavey patent; whether the cause of action is barred by laches or estoppel; whether Whitehall damaged Western and Litton by tortious interference with contractual business relations; and whether Western is entitled to attorney's fees for an "exceptional case."

1. The Court has jurisdiction of subject matter and parties pursuant to 28 U.S.C. § 1338(a) in that the action arises out of the Patent Laws, 35 U.S.C. § 1 *et seq.*

2. Venue lies in this district pursuant to 28 U.S.C. 1400(b).

3. A lawfully issued patent is presumed valid. 35 U.S.C. § 282; *Railex Corp. v. Speed Check Co.*, 457 F.2d 1040, 1043, 173 U.S.P.Q. 513, 515 (5th Cir.), *cert. denied*, 409 U.S. 876, 93 S.Ct. 125, 34 L.Ed.2d 128 (1972). Challengers Western and Litton have the burden of showing the patent is invalid by clear and convincing evidence. 35 U.S.C. § 282; *South Corp. v. United States*, 690 F.2d 1368, 1369, 215 U.S.P.Q. 657, 658 (Fed.Cir.1982). The ultimate burden of persuasion never shifts from the patent challenger. *Id.; Medtronic Inc. v. Cardiac Pacemakers, Inc.*, 721 F.2d 1563, 1566, 220 U.S.P.Q. 97, 100 (Fed.

Cir.1983). Even when more relevant prior art than that cited by the examiner is introduced, there is no change in the presumption of validity or in the requirement of clear and convincing proof of invalidity. *Connell v. Sears, Roebuck & Co.*, 722 F.2d 1542, 1549, 220 U.S.P.Q. 193, 199 (Fed.Cir. 1983).

■■■ 4. The United States Constitution requires a promotion of "the progress of science and useful arts" for patentability. U.S. Const. art. 1, § 8, cl. 8. The three statutory tests for patentability are utility, novelty, and nonobviousness. 35 U.S.C. §§ 101–03. Lack of candid disclosure to the patent office during the application period can invalidate a patent. *Beckman Instruments, Inc. v. Chemtronics, Inc.*, 428 F.2d 555, 165 U.S.P.Q. 355 (5th Cir.), *cert. denied*, 400 U.S. 956 (1970).

■■ 5. The Pavey patent is useful under both the constitutional and statutory standards in that it improves the signal-to-operating-noise ratio of streamer systems, as evidenced by its commercial success and extensive use by the seismic surveying industry, including Western.

■■■ 6. The Pavey patent reveals novelty. Novelty requires that there be no substantial identity to another existing product in regard to means, operation, and result and no anticipation by or lack of invention over prior art. 35 U.S.C. §§ 102, 271. If two devices work to the same result by substantially the same means, they are considered to be the same under the doctrine of equivalents. *Gaddis v. Calgon Corp.*, 506 F.2d 880, 887 (5th Cir.1975). If, however, they operate "in a different way or produce a substantially different result", they may be patentable despite similarity to prior art. *United States v. Adam*, 383 U.S. 39, 86 S.Ct. 708, 15 L.Ed.2d 572 (1965); *Sterner Lighting, Inc. v. Allied Electrical Supply*, 431 F.2d 539, 166 U.S.P.Q. 454 (5th Cir.1970), *cert. denied*, 401 U.S. 909, 91 S.Ct. 869, 37 L.Ed.2d 807 (1971). The Pavey device's attenuation performance is an improvement upon earlier multichannel streamers, several thousand feet in length, composed of the same basic parts and with the same structure and de-

signed for the same purpose. However, as will be discussed, the difference in performance, while sufficient to nullify a challenge of anticipation, is not dispositive of the issue of obviousness.

■■■ 7. As noted, the Pavey patent is not void for anticipation under § 102. To determine whether anticipation invalidates a patent, the trier of fact must consider the scope and the elements of the claim and their significance in light of the patent's specification and its prosecution file history and in comparison to the disclosure of each claimed anticipatory reference. *SSIH Equipment S.A. v. USITC*, 718 F.2d 365, 377, 218 U.S.P.Q. 678, 688 (Fed.Cir.1983). To constitute anticipation, there must be a single prior art reference disclosure that contains every element of the claimed invention. *Connell v. Sears, Roebuck & Co.*, 722 F.2d 1542, 1548, 220 U.S.P.Q. 193, 198 (Fed.Cir.1983). *See* finding of fact (hereinafter "FF") 24.

8. The scope of the prior art, a factual determination, is that art "reasonably pertinent to the particular problem with which the inventor was involved." *Stratoflex, Inc. v. Aeroquip Corp.*, 713 F.2d 1530, 1535, 218 U.S.P.Q. 871, 876 (Fed.Cir.1983) (*quoting In re Wood*, 599 F.2d 1032, 1036, 202 U.S.P.Q. 171, 174 [C.C.P.A.1979]); *see* FF 27(a).

■■■ 9. The Pavey patent is void for obviousness. In contrast to the single-reference requirement for anticipation, the test of obviousness is whether "the claimed invention as a whole, in light of all the teachings of the references in their entireties, would have been obvious to one of ordinary skill in the art at the time the invention was made." 35 U.S.C. § 103; *Connell v. Sears, Roebuck & Co.*, 722 F.2d 1542, 1549, 220 U.S.P.Q. 193, 199 (Fed.Cir. 1983). However, merely combining prior art references does not make an invention obvious unless something in the prior art suggests an advantage to be derived from uniting their teachings. *In re Sernaker*, 702 F.2d 989, 995–96, 217 U.S.P.Q. 1, 6–7 (Fed.Cir.1983). In light of the varied experimentation with vibration isolators dur-

ing the early 1960's that was not reported to the PTO, the GSI SUE cables, designed and supplied by Pavey's company prior to the Pavey patent's grace period, clearly foreshadowed the application of nylon cord as the internal member for the Pavey elastic streamer in long cables.

a. These cables were substantially similar to the Pavey patent except for their use of a single rather than a plurality of nylon cables employed in a short, single-channel streamer. Testimony has indicated that conversion from short to long, multichannel streamers can be readily accomplished by an ordinary person skilled in the art.

b. The statutory bars of § 102(b) are established by a showing of nonsecret, nonexperimental use or of an inventor's use of the invention for trade and profit in the United States prior to the critical date. *In re Yarn Processing Patent Validity Litigation*, 498 F.2d 271, 277, 183 U.S.P.Q. 65, —— (5th Cir.1974); *Strong v. General Electric Co.*, 434 F.2d 1042, 1043–44, 168 U.S.P.Q. 8, 9 (5th Cir.1970). Public use means use of the product in its natural, intended way, even when hidden from public view. *Electric Storage Battery Co. v. Shimadzu*, 307 U.S. 5, 19–20, 59 S.Ct. 675, 683–84, 83 L.Ed. 1071, 41 U.S.P.Q. 155, 161 (1939). A public use or placing on sale prior to the critical date under 35 U.S.C. § 102 may support an obviousness rejection under § 103. *In re Kaslow*, 707 F.2d 1366, 1374, 217 U.S.P.Q. 1089, 1095 (Fed.Cir.1983). While the GSI short cables, the obvious prototype of the Pavey long streamer described by Joe Rowland, James Campbell Watt, and Alfred Gronnestad, were not identical to the Pavey streamer, they clearly deserve considerable weight in the determination of obviousness. The general rule is that an inventor's own work cannot be cited against him as prior work in the determination of his invention's obviousness. A recognized exception is where there has been a public use prior to the critical date before the patent application. D. Chisum, 2 *Patents* § 503[3](f) at 5.104.-1–5.105 (1986); *In re Jaeger*, 241 F.2d 723, 726, 112 U.S.P.Q. 477, 479, 44 C.C.P.A. 767 (1957). 35 U.S.C. § 102(b) bars a patent if the invention was in public use or on sale in the United States before the one-year grace period prior to patent application. Complete identity of the patented invention and the predecessor used or sold is not required if the addition, substitution, or improvement that distinguishes the two would have been obvious, as in the present case, to a person with ordinary skill in the field at the time. D. Chisum, 2 *Patents* § 6.02[3] at 6–26 (1986); *Tool Research & Engineering Corp. v. Honcor Corp.*, 367 F.2d 449, 454, 151 U.S.P.Q. 236, 241 (9th Cir.1966), *cert. denied*, 387 U.S. 919, 87 S.Ct. 2032, 18 L.Ed.2d 972 (1967). Whitehall has made no claims of experimental use to exempt the Pavey streamer from the on-sale and public-use bars. Abandonment cannot be justified since Whitehall and Seismic continued to make and sell Pavey streamers.

c. Furthermore, the court must consider all evidence bearing on the issue, including secondary indicia of validity such as commercial success, long felt but unsolved need, failure of others to remedy, and licensing or copying by others. *Graham v. John Deere Co.*, 383 U.S. 1, 17–18, 86 S.Ct. 684, 693–94, 15 L.Ed.2d 545 (1966); *Environmental Designs, Ltd. v. Union Oil Co.*, 713 F.2d 693, 695, 218 U.S.P.Q. 865, 867 (Fed.Cir.1983), *cert. denied*, 464 U.S. 1043, 104 S.Ct. 709, 79 L.Ed.2d 173 (1984); *see* FF 27. As suggested by FF 25(e), there must be a nexus, largely missing here, between the facts asserted as secondary considerations supporting a patent and the merits of the putative invention. *Cable Electric Products, Inc. v. Genmark, Inc.*, 770 F.2d 1015, 1026–28, 226 U.S.P.Q. 881, 888 (Fed. Cir.1985). Many factors besides Pavey's elastic section contributed to the success of the streamer sold by Whitehall from 1966 through the seventies.

10. Of the Pavey patent's nine claims, four are independent, and five, dependent. Claims 1, 4, 5, 6, 7, 8, and 9 are in dispute for patent validity.

a. Claims 2 and 3 are dependent on claim 1, which recites a seismic prospecting system for discovering underwater geological formations during towing at a continuous, relatively high rate of speed. The system is composed of a tow cable, followed by an

elastic dead section, followed by a live section, a configuration known and used commercially in the prior art, in particular in the Paslay patent on which it reads. The Paslay patent entered the public domain in 1966. The modification of a plurality of elastic, nylon strain cable throughout the new dead section differentiates dead section from Paslay's. Elastic sections were used as isolators in Loper, Wilcoxon, and other prior art. The Pavey system functions to attenuate interference with the hydrophones' detection of seismic sounds by vibrations from the tow cable. One Chesapeake VIM utilized a plurality of bungee cords covered by nylon strands as an elastic section. Nylon cable, whose inherent properties were well known in marine art, was used for an elastic section with a single rope in the SUE cable made by Pavey's company for GSI's commercial use in the early 1960's before the critical date of the Pavey patent. Application of the same principles to the conventional, long streamers for which Pavey held the Paslay patent at the time was an obvious step.

b. Independent claim 4 adds details of short steel cables that extend through end plugs in oil-tight containers at the elastic section's ends and attach to the three, nylon strain members. The GSI SUE cables had such a design in the connection of its single nylon rope to the plurality of short steel cables. Claim 9, dependent on claim 4, recites generally the use of spacers and teaches the folding and binding by rubber bands of conductors, a known practice, to provide the slack need to avoid their breaking when the nylon members stretch. These, too, were present in the GSI cables.

c. Independent claim 5 details the stretch isolator section with its oil-filled and -sealed flexible casing, end plugs, shorter metal strain cables, plurality of plastic spacers, members to secure these spacers to the cables to prevent their movement, and signal conductors. Dependent claim 6 recites in greater detail the folding and binding by rubber bands of the signal conductors to provide slack and allow for easier assembly.

d. Independent claim 7 broadly defines the elastic stretch section and its location between the tow cable and the detection streamer in order to apply towing force while attenuating vibration. Dependent claim 8 adds details of the spacers and signal conductors.

11. Where a patent's challenger presents prior art not cited by the examiner and more pertinent than the references he did cite, the challenger's burden of proof in rebutting the statutory presumption of a patent's validity under 35 U.S.C. § 282 is more easily carried. *See Aktiebolaget Karlstads Mekaniska Werkstad v. I.T.C.*, 705 F.2d 1565, 1577, 217 U.S.P.Q. 865, —— (Fed.Cir.1983); *EWP Corp. v. Reliance Universal, Inc.*, 755 F.2d 898, 905, 225 U.S.P.Q. 20, —— (Fed.Cir.1985). It cannot be presumed, where inequitable conduct is alleged against the patentee, as here, that the PTO considered prior art of particular relevance if it was not cited. *Driscoll v. Cebalo*, 731 F.2d 878, 221 U.S.P.Q. 745, —— (Fed.Cir.1984). The Court concludes that Western and Litton have effectively carried their burden and rebutted the presumption by establishing a convincing *prima facie* case of invalidity through relevant and material uncited prior art, as well as by significant testimony. Subsequently, Whitehall failed to come forward with sufficient evidence to counter this challenge, especially in regard to the single most pertinent prior art reference, the Seismic SUE cables provided to and used by GSI in the early 1960's.

12. 35 U.S.C. § 112 requires that an inventor adequately disclose his invention, the manner of making and using it so that a person skilled in the art can practice it (the "enabling requirement"), and the best mode known to the inventor at the time of application for carrying out his invention. The Pavey patent complies with the enablement requirement in the second paragraph of § 112, which proscribes indefiniteness. While the patent claims do not recite the use of nylon per se, it is part of the file wrapper because the examiner specified that material in his initial rejection of Pavey's application, and thus must

be considered in construing the patent. *See, e.g., ACS Hospital Systems, Inc. v. Montefiore Hospital*, 732 F.2d 1572, 1577, 221 U.S.P.Q. 929, —— (Fed.Cir.1984). Whitehall established that tying off ropes through eye splices is well known in marine art. The amount of detail required in claims depends upon the particular invention, the prior art, and the compliance of the specification with the first paragraph of § 112. If these reasonably apprise one skilled in the art of the utilization and scope of the invention with language as precise as the subject matter allows, they are sufficient. Here Western and Litton's expert witness, Dr. Hoskins, praised the craftsmanship and lucidity of the Pavey patent. Reasonable dimensional flexibility is necessary also because, as testimony regularly indicated, seismic streamers must be customized for purchasers according to their intended uses.

13. With respect to § 112's best mode requirement, the Court concludes that the Pavey patent describes the best way known to the inventor at the time of application to carry out his invention. Under § 112, the adequacy of the disclosure is measured by a subjective standard: the challenging party must show that there is such concealment, intentional or accidental, of the best mode known to the inventor at the time of application or that the disclosure is so poor as to constitute constructive concealment. *In re Sherwood*, 613 F.2d 809, 816 (C.C.P.A.1980). Western and Litton have failed to show such concealment by Pavey.

14. Inequitable conduct before the PTO renders all the claims of the Pavey patent unenforceable. *J.P. Stevens Co. v. Lex Tex Ltd.*, 747 F.2d 1553, 1560–61, 223 U.S.P.Q. 1089, 1093 (Fed.Cir.1984), *cert. denied*, 106 S.Ct. 73 (1985). Given the *ex parte* nature of patent prosecution, the PTO relies upon the candor and good faith of the applicant to disclose material information known to him at the time. *Environmental Designs v. Union Oil Co.*, 713 F.2d 693, 698, 218 U.S.P.Q. 865, 870 (Fed. Cir.1983), *cert. denied*, 464 U.S. 1043, 104 S.Ct. 709, 79 L.Ed.2d 173 (1984). In regard to the issue of inequitable conduct, a patent applicant's duty of disclosure depends upon a balancing of the materiality of uncited art with the applicant's intentions. PTO Rule 1.56(a), 37 C.F.R. 1.56(a) (1985), provides in part that prior art "is material where there is a substantial likelihood that a reasonable examiner would consider it important in deciding whether to allow the application to issue as a patent." The standards for the materiality of the references and for the culpability of the applicant vary inversely: the more pertinent the withheld information, the less the need to show a scheme to defraud, and vice versa. There is no fixed standard. *See American Hoist & Derrick Co. v. Sowa & Sons, Inc.*, 725 F.2d 1350, 1362–64, 220 U.S.P.Q. 763, 772–774 (Fed.Cir.), *cert. denied*, 469 U.S. 821, 105 S.Ct. 95, 83 L.Ed.2d 41 (1984). Evidence of deliberate scheming to withhold material references is not necessary to constitute inequitable conduct; gross negligence, where a reasonable person in the patent applicant's position s have realized the materiality and submitted the prior art to the examiner, suffices. *J.P. Stevens Co. v. Lex Tex Ltd.*, 747 F.2d 1553, 1560, 223 U.S.P.Q. 1089, 1092 (Fed.Cir.1984), *cert. denied*, —— U.S. ——, 106 S.Ct. 73, 88 L.Ed.2d 60 (1985). Pavey clearly withheld information about developments in seismic streamers with vibration isolation modules used under continuous towing, and he thereby tainted the patent. While he in good faith may have been unaware of the Loper invention, he knew or should have known of Chesapeake's towed arrays using both external, nylon-reinforced hose or internal, bungee- cord members, and especially he should have known of the most pertinent art, the SUE cables provided by his own small company to GSI for use in oil exploration. While the examiner who passed the Pavey patent did not testify, Donald Banner, a patent lawyer and former Commissioner of the PTO, demonstrated clearly and convincingly that this prior art should have been disclosed, that it was necessary for proper consideration of patentability, and that had it been available, the patent would have been denied. The totality of circumstances surrounding Pavey's inequitable conduct in breaching

his duty of candor clearly reveals if not a specific intent to deceive the examiner, at least sufficient misrepresentation to constitute neglect of his duty and gross negligence. This failure renders the patent unenforceable. *See Driscoll v. Cebalo*, 731 F.2d 878, 885, 221 U.S.P.Q. 745, —— (Fed. Cir.1984); *Orthopedic Appliances, Inc.*, 707 F.2d 1376, 1383, 217 U.S. P.Q. 1281, 1286 (Fed.Cir.1983).

15. In consideration of judicial economy, district courts should decide and enter judgment upon the issues of patent validity and infringement when they are raised in one suit. *Lindenmann Maschinenfabrik GMBH v. American Hoist and Derrick Co.*, 730 F.2d 1452, 1463, 221 U.S. P.Q. 481, —— (Fed.Cir.1984). To infringe on an invention, a product must come within a claim, i.e., utilize the same combination of steps or elements, of the patent in suit. *Shatterproof Glass Corp. v. Libbey-Owens Ford Co.*, 758 F.2d 613, 225 U.S.P.Q. 634 (Fed.Cir.1985). While Western's copies of the Pavey patent from 1972 until after the suit was filed manifestly infringed the patent, the subsequent recent design employing a single-nylon-rope elastic section without spacers does not. Pavey amended and limited his claims to a plurality of elastic members during the prosecution and may not, under the doctrine of file wrapper estoppel, enlarge their scope to include the single-rope configuration. *Ingersoll-Rand Co. v. Brunner & Lay, Inc.*, 474 F.2d 491, 498 (5th Cir.1973). Pavey's patent teaches the use of solid spacers, and he testified that the spacers and their positioning were vital to the function of his system.

16. The statute of limitations for patent-infringement suits restricts the period for recovery of damages to the six years prior to the filing of a complaint, but it does not limit the patentee's right to maintain an action. 35 U.S.C. § 286; *Studiengesellschaft Kohle v. Eastman Kodak Co.*, 616 F.2d 1315, 1325, 206 U.S.P.Q. 577, 586 (5th Cir.1980). Here, April 13, 1973 is the critical date for measuring delay.

17. Laches does not bar recovery of damages from Western and Litton for patent infringement. The equitable defense of laches can be invoked where the plaintiff has unreasonably and inexcusably delayed in asserting his patent rights and thereby materially prejudices the defendant. *Leinoff v. Louis Milona & Sons, Inc.*, 726 F.2d 734, 741, 220 U.S.P.Q. 845, 850 (Fed.Cir.1984).

a. Unreasonable delay is determined by analogy to the six-year limitation on damages under 35 U.S.C. § 286. The delay is measured from the critical time when the plaintiff knew or should have known through the exercise of reasonable diligence that the defendant was infringing his patent. *Studiengesellschaft Kohle v. Eastman Kodak Co.*, 616 F.2d 1315, 1326, 206 U.S.P.Q. 577, 587 (5th Cir.1980). Ignorance of infringement alone will not suffice as an excuse; the patent owner must be diligent in making inquiries reasonably suggested by the circumstances. *Potash Co. v. International Minerals & Chemical Corp.*, 213 F.2d 153, 155, 101 U.S.P.Q. 264, 265 (10th Cir.1954). Thus the issue is not limited to actual knowledge but encompasses imputed knowledge. Here, knowledge of infringement must be imputed to Whitehall before 1973.

1. Whitehall appears to have waited as long as it thought possible even under the assumption that the Court would accept as the critical date January 1974, when Whitehall claims that Western's successful bid for the Esso contract alerted it to possible infringement.

2. However, the Court is persuaded that Whitehall should have inquired earlier, given the loss to Western of a number of its key employees involved in the manufacture of the Pavey streamer. It was common knowledge in the cable shop, and both Pavey and Whitehall's president, Lee Webster, were fully aware that Buddy Beam had gone to work for Western. Furthermore, the change in the nature of Western's orders from Seismic and Western's expansion and building of new plants should reasonably have given notice of the need for inquiry.

3. Illness is not generally recognized as an adequate excuse for a plaintiff's delay in bringing suit. D. Chisum, 4 *Patents*

§ 19.05[2][iii] at 19–180 (1986); *Dixon v. AT & T*, 159 F.2d 863, 864, 72 U.S.P.Q. 253, —— (2d Cir.1947). Thus a lingering illness more remote than that of an immediate party, here of Mrs. Pavey, is not sufficient to excuse a seven-year delay. While Pavey's involvement is central, he could have contributed as a consultant during this period, while Whitehall, as owner of the patent since 1955, was competent to handle the matter.

b. In regard to the element of prejudice, Western and Litton were injured by Whitehall's delay in prosecution. However, as an equitable defense, laches involves a balancing of equities, which in the present case causes the Court to deny the defense. *Potash Co. v. International Minerals & Chemical Corp.*, 213 F.2d 153, 156, 101 U.S.P.Q. 264, 266 (10th Cir.1954).

1. A six-year delay is presumptively injurious to the defendant and shifts the burden of going forward to the plaintiff to justify his delay and to show lack of injury to defendant. *Leinoff v. Louis Milona & Sons, Inc.*, 726 F.2d 734, 742, 220 U.S.P.Q. 845, 850 (Fed.Cir.1984). Whitehall has failed to come forward with sufficient evidence to rebut the presumption.

2. Delay may materially impair a defendant's ability to defend his suit through deaths of critical witnesses, dulling of memories, and loss of documents. *Studiengesellschaft Kohle v. Eastman Kodak Co.*, 616 F.2d 1315, 1325–26, 206 U.S.P.Q. 577, 586–87 (5th Cir.1980). While the significant figures of Raymond Hicks, Pavey's patent attorney, and Ellis Huffstetler, GSI's expert employee concerning the Seismic SUE cables used in the early 1960's, have died and memories inevitably have dimmed, the loss has not prevented Western and Litton from effectively presenting their case.

3. The Fifth Circuit has also given weight to prejudice through heavy capital investment and business expansion while the plaintiff slept on his rights and let the infringer believe the patent would not be enforced. *Studiengesellschaft Kohle v. Eastman Kodak Co.*, 616 F.2d 1315, 1325–26, 206 U.S.P.Q. 577, 586–87 (5th Cir.1980). Western clearly made extensive financial outlays in expanding its Galveston facility and in building its Alvin plant, although there has been conflicting evidence regarding the percentage of those endeavors devoted to the manufacture of elastic streamer sections in reliance on Whitehall's inaction.

4. However, the doctrine of laches involves a balancing of equities. There is fault on both sides here. While investing substantial capital in its expanding manufacture of elastic sections, Western avoided licensing fees, royalties, and the expense of continuing purchases of streamers from Whitehall, the patent owner, while reaping the benefits of profit and good will from sales to third parties. If Western's patent attorney did perform unsuccessfully an assignment search for patents before Western commenced manufacturing copies of the Pavey streamer, it appears to be a feeble attempt in face of a potential infringer's duty to uncover any legal restraints on his right to manufacture a product freely. Although Western claims ignorance of the existence of the patent, J.W. Ferguson's testimony indicates that warning was given to its manufacturing foreman Buddy Beam. The patent was discussed in literature in the mid 1970's. Nevertheless, Western made no efforts from 1972–79 to discover if Whitehall actually knew of its activities. Even more egregious, however, is Western's deliberate copying of the Pavey streamer without the least investment in or effort to develop its own. *See TMW Manufacturing Co., Inc. v. Dura Corp.*, 592 F.2d 346, 349, 201 U.S.P.Q. 433, 435 (6th Cir.1979). Such conduct shifts the equities to favor Whitehall.

18. Enforcement of the Pavey patent is not barred by the equitable defense of estoppel for misrepresentation. When one party acts so as to mislead another, who in turn reasonably relies upon the misleading action to his detriment, the trial judge may preclude the patent holder from enforcing his patent prospectively through injunction or damages for continu-

ing infringement, thus causing the infringement action to fail completely. *Studiengesellschaft Kohle v. Eastman Kodak Co.*, 616 F.2d 1315, 1330, 206 U.S.P.Q. 577, 590–91 (5th Cir.1980). Silence without further justification, such as a threat of suit followed by a patent owner's sleeping on his rights, is unlikely to raise estoppel. *See Watkins v. Northwestern Ohio Tractor Pullers*, 630 F.2d 1155, 208 U.S.P.Q. 545 (6th Cir.1980); *TMW Manufacturing Co., Inc. v. Dura Corp.*, 592, F.2d 346, 350, 201 U.S.P.Q. 433 (6th Cir.1979). Such was not the case here. Misleading silence, to constitute acquiescence, must be intentional and in bad faith. *Id.* Here, Whitehall's silence has not been shown to be deliberate or in bad faith. Western's minimal effort to discover if a patent existed before its calculated copy of Whitehall's streamer does not support a claim of reasonable reliance and precludes an imposition of estoppel.

19. Whitehall is not liable for tortious interference with Western's business contractual relationships. To establish liability for tortious interference with contract of another party, Texas common law requires the existence of a contract; an intentional and knowing interference by the defendant that proximately causes actual injury to the plaintiff; and an absence of legal right or legal justification that would excuse the defendant's actions. *Armendariz v. Mora*, 553 S.W.2d 400, 404 (Tex.Civ.App.—El Paso 1977, writ ref'd n.r. e.); *Black Lake Pipe Line Co. v. Union Construction Co.*, 538 S.W.2d 80, 91 (Tex. 1976). The contract between Western and Esso was created when Esso accepted Western's bid. The record clearly and convincingly shows interference in Whitehall and Seismic's knowing failure to furnish Western with ordered Multidyne hydrophones following the award of the contract to Western. However, there is conflicting testimony among Western's employees and officers as to whether actual damage to Western's financial resources or good will was suffered and as to whether Western in the long view was not better off since it became a self-supplier of hydrophones by purchasing Houston Products. Further-

more, the contract was performed without the Multidyne phones. Even more importantly, interference is privileged where the defendant in good faith exercises his own legal rights or where his interest is equal or superior to the interest of the plaintiff in the subject matter. *Black Lake Pipe Line v. Union Construction Co.*, 538 S.W.2d 80, 91 (Tex.1976); *Terry v. Zachry*, 272, S.W.2d 157 (Tex.Civ.App.—San Antonio 1954, writ ref'd n.r.e.). By their possession of the presumptively valid Pavey and Multidyne patents, each of which created a seventeen-year monopoly right, Whitehall and Seismic had a legal right to refuse to sell the hydrophones for use in an infringing streamer to be sold to a third party. During the seventeen-year period, the patent owner has the right to determine who may use, make, or sell its patented invention. 35 U.S.C. § 261.

20. The Court denies Western and Litton's request for attorney's fees. In its discretion, a court may deem a case "exceptional" and award attorney's fees under 35 U.S.C. § 285 where litigation has been vexatious, unduly protracted, or hampered by the patent applicant's wrongful conduct or the infringer's unreasonable, willful and/or bad faith belief that he could infringe on a patent. *Parker v. Motorola, Inc.*, 524 F.2d 518, 535 (5th Cir.1975); *True Temper Corp. v. C F & I Steel Corp.*, 601 F.2d 495 (10th Cir.1979); *Rosemount, Inc. v. Beckman Instruments, Inc.*, 727 F.2d 1540, 1548 (Fed.Cir.1984). Usually the inequitable conduct must be deliberate to warrant the award, however. As noted, Western and Litton have not shown through clear and convincing evidence that Pavey intentionally misled the PTO.

22. Since the Pavey patent expired in 1984, the issue of injunctive relief is moot.

Based upon the above, the Court finds that the Pavey patent is invalid for obviousness, for prior use, and for inequitable conduct before the PTO. Western and Litton have carried their heavy burden by clear and convincing evidence and produced a *prima facie* case of patent invalidity, which Whitehall has failed to rebut. Be-

cause Western and Litton have not shown that Pavey's inequitable conduct was intentional, the Court will not grant attorney's fees. Had the patent not been found invalid, Western and Litton would be liable for damages for infringement from 1973 until they ceased manufacturing, selling, and using copies of the Pavey streamer. Dubious conduct on the part of Western and Litton bars the application of the equitable doctrines of laches and estoppel. Furthermore, Whitehall, because of its superior interest in both the Multidyne hydrophone and the Pavey streamer under patents presumably valid at the time, is not liable for tortious interference with Western and Litton's contractual business relationships with third parties.

Accordingly, it is hereby ORDERED that Whitehall's request for damages for infringement of U.S. Patent No. 3,319,734 is DENIED for patent invalidity.

Counsel for Defendants shall prepare a proposed final judgment, approved as to form by all counsel, no later than August 10, 1986.